IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ACCESS LIVING OF METROPOLITAN CHICAGO, a not-for-profit corporation; MICHELLE GARCIA; RAHNEE PATRICK; and JUSTIN COOPER, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. |
| v. | ) ) | Judge |
| UBER TECHNOLOGIES, INC., a corporation; and RASIER, LLC, | ) ) ) | Jury Demanded |
| Defendants. | ) ) | |

**COMPLAINT FOR CONTINUING VIOLATIONS OF
THE AMERICANS WITH DISABILITIES ACT**

Plaintiffs Access Living of Metropolitan Chicago ("Access Living"), Michelle Garcia, Rahnee Patrick, and Justin Cooper, for their complaint against Defendants Uber Technologies, Inc. and Rasier, LLC (collectively "Uber"), state:

**Background**

1. Uber offers a travel service that is unusable for people who require wheelchair accessible vehicles. From Uber's start in Chicago in 2011 until August 2015 (the last period for which information is publicly available), it provided only 14 accessible rides despite an overall industry volume at that time of three million rides a month.

2. Transportation access is a central civil rights issue for people with disabilities. In 1978 in Denver, the lack of accessible transportation led a group of wheelchair users to block buses with their own bodies to protest the buses' inaccessibility. That protest grew to a national movement with the formation of ADAPT, a national disability rights organization, in 1983. Access Living joined with ADAPT to secure lifts on Chicago Transit Authority ("CTA") buses

in 1989. Eventually this movement combined with others to achieve passage of the Americans with Disabilities Act ("ADA"), with its guarantee of full participation in all aspects of society and the end of the historical isolation and segregation of people with disabilities.

3. Uber and similar companies are now a significant part of our national transportation system and are positioning themselves to be an indispensable part of the transportation systems of the future. Uber claims its services are not subject to the ADA, and its service to people who require wheelchair accessible vehicles ranges from token to non-existent. That position threatens a return to the isolation and segregation that the disability rights movement has fought to overcome. This action seeks a declaration that the ADA requires Uber to provide equal access to people with disabilities, and to require that Uber provide service to those who require wheelchair accessible vehicles.

**Overview of the Case**

4. In 1990, when Congress passed the ADA, it embraced a national mandate to eliminate discrimination against persons with disabilities, including discrimination in travel services.

5. Uber offers access to travel services for persons in Chicago. Uber characterizes its travel services as cost-effective, convenient, widely-available, timely, reliable, efficient, and safe. Users request transportation through Uber's mobile software application ("app"), and Uber arranges rides between passengers and a fleet of drivers. Uber does not own the vehicles in this fleet. Instead, it maintains control over the cost, the vehicle, the driver qualifications, and the general ride experience for each trip. Uber and similar providers are rapidly supplanting traditional taxi and other transportation services and becoming a primary option for on-demand transportation.

6. In violation of the ADA, Uber does not offer equivalent access to its travel service to Chicago motorized wheelchair users and other mobility-device users who cannot transfer into traditional vehicles. Plaintiffs bring this action to force Uber to end its discrimination against these users.

7. Motorized wheelchairs are used by persons with disabilities who cannot use a manual wheelchair. Motorized wheelchairs users may require motorized aids for lack of arm strength, lack of upper body strength, or lack of coordination to operate a manual wheelchair.

8. Motorized wheelchairs are heavy and do not fit into the trunk of a car. Those who use them require wheelchair accessible vehicles with ramps and lifts to accommodate motorized wheelchairs. Wheelchair accessible vehicles are widely used and readily available.

9. Access Living is a not-for-profit cross-disability advocacy organization in Chicago. Its mission is to protect and advance the civil rights of individuals with disabilities and encourage their ability to live independently. Access Living performs its mission by offering peer-oriented independent living services, public education programs, individualized and systemic advocacy, and by enforcing civil rights on behalf of disabled persons.

10. As required by 29 U.S.C. § 796f-4(c)(6), Access Living is governed and staffed by a majority of people with disabilities within the meaning of the ADA. Fourteen percent of Access Living's employees use motorized wheelchairs, and 20 percent of its board members either use motorized wheelchair or cannot transfer to a standard vehicle from their wheelchairs. All these individuals lack equivalent access to Uber's travel services. When Access Living transports those employees or board members, it must divert resources that would otherwise be used to fulfill its mission. Access Living seeks relief against Uber because: (a) it is incurring increased costs of transporting persons who lack access to Uber's travel options; and (b) Uber's

denial of equivalent services to motorized wheelchair users defeats Access Living's core mission to empower persons with disabilities to live independently.

11. Plaintiffs Michelle Garcia, Rahnee Patrick, and Justin Cooper are Access Living employees or volunteers who all are disabled persons within the meaning of the ADA. They are either motorized wheelchair users themselves, or they associate with motorized wheelchair users. All live in Chicago and want to use Uber. All have credit cards and smart phones and can download the app, but they are deterred from doing so because Uber does not offer equivalent access to its transportation services to motorized wheelchair users.

12. Uber's ADA violations are ongoing. Uber representatives have long promised representatives of Access Living that Uber will include wheelchair accessible vehicles in its service in a manner that would create a viable service, but Uber has not created even a viable service, let alone a service equivalent to that enjoyed by non-disabled individuals. Uber's discrimination against motorized wheelchair users thus persists. Plaintiffs seek: (a) a declaration that the ADA requires Uber to provide equivalent services to motorized wheelchair users and others who cannot transfer into traditional vehicles, and Uber violates the ADA by not doing so; (b) an order requiring Uber to provide service to motorized wheelchair users that is equivalent to the service it provides to general public, taking into account cost of use, response time, geographic area of service, availability of service, availability of information, reservations capability, and similar factors; and (c) recovery of their reasonable attorney fees and costs.

## Parties

13. Plaintiff Access Living is a not-for-profit corporation in Chicago, Illinois.

14. Plaintiff Michelle Garcia lives in Chicago and is a person with a disability within the meaning of the ADA, 42 U.S.C. § 12102.

15. Plaintiff Rahnee Patrick lives in Chicago and is a person with a disability within the meaning of the under the ADA, 42 U.S.C. § 12102.

16. Plaintiff Justin Cooper lives in Chicago and is a person with a disability under the ADA, 42 U.S.C. § 12102.

17. Defendant Uber Technologies, Inc. is a for-profit company headquartered in California. Uber provides access to travel services to individuals in Chicago.

18. Defendant Rasier, LLC, is a for-profit Delaware corporation with headquarters in California. Rasier holds the Transportation Network Provider license that the City of Chicago requires for Uber to operate its travel services in Chicago.

## Jurisdiction and Venue

19. The Court has subject matter jurisdiction under: (a) 28 U.S.C. § 1331, which grants district courts original jurisdiction of all civil actions arising under the laws of the United States; and (b) 28 U.S.C. § 1343(a)(4), which grants district courts original jurisdiction of any civil action to redress or secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

20. Venue is proper under 28 U.S.C. § 1391(b). The events or omissions giving rise to this action occurred in the Northern District of Illinois.

## Uber's Services

21. In Chicago, Uber calls its primary service UberX. Uber operates other services under the names UberXL, UberSELECT, UberBLACK, and UberWAV, which primarily differ from UberX in the model of vehicle dispatched by Uber. UberX and these other services are available to customers with a smartphone who download the app, open an Uber account, and register a credit card to pay for their rides.

5

22. Uber also offers UberASSIST, which provides help boarding vehicles, and UberPOOL, which operates like UberX but allows riders with similar trips to travel as a carpool.

23. Finally, Uber offers UberTAXI, which is nothing like Uber's other services. UberTAXI is simply a referral to Chicago's taxi dispatch service to request a licensed taxi.

24. Except for UberTAXI, Uber controls all aspects of its travel service. Uber uses a formula to fix the total charge that passengers pay, taking into account the passenger's pickup and drop off locations, a base fare, a per-minute-of-travel fare, and a per-mile-of-travel fare. Uber also fixes temporary price increases for passengers, known as "surge pricing." Surge pricing increases the cost of travel at time periods which Uber chooses. Neither the passenger nor the driver negotiates the cost of travel. Uber insures the rides it provides to its passengers.

25. Except for UberTAXI, Uber decides the type and maximum age of car used for each of its services. For example, Uber requires a four-door sedan for UberX travel, inspects vehicles used for UberX travel, and permits only those vehicles passing its inspection to be used for UberX travel. Uber arranges with companies to lease Uber-approved vehicles to UberX drivers.

26. Except for UberTAXI, Uber controls the type of driver that serves its users. Uber has minimum requirements for its drivers' age, experience, licensing, and driving records. Uber conducts criminal background checks on drivers, and operates its own system for deciding which drivers it will use to transport Uber passengers.

27. Except for UberTAXI, Uber assigns the driver for each trip request, and can deactivate drivers who too often cancel the rides that Uber assigns them.

28. Except for UberTAXI, Uber oversees the quality of the Uber ride experience. Uber uses a driver rating system to rate Uber drivers. On information and belief, a driver rating

of 4.5 out of 5 can cause Uber to deactivate a driver. Uber maintains community guidelines and will deactivate drivers who violate those guidelines. Uber advises its drivers to keep bottled water, candy, phone chargers, vomit bags, cleaning cloths, and cleaning spray on hand for customers. Uber tells its drivers to offer customers the opportunity to select the radio station of their choice. Uber uses the driver rating system to enforce vehicle cleanliness requirements. Uber also uses a passenger rating system to decide if a passenger will not be allowed to use Uber's travel services.

29. UberX is virtually unavailable to motorized wheelchair users and manual wheelchair users who cannot transfer into a car. For them, Uber primarily uses UberTAXI, which refers such persons to an independent taxi service with wheelchair accessible vehicles. Uber receives a fee for the referral to and collecting the fare for the independent taxi service. On information and belief, UberTAXI is a small part of Uber's business in Chicago.

30. For UberTAXI, unlike the rest of Uber's services, Uber does not regulate the cost of travel, the type of vehicle used, the driver, the convenience to the passenger, the timeliness and efficiency of the transportation service, or the quality of the passenger's experience.

31. UberTAXI does not offer its passengers service that is equivalent to Uber's primary service, UberX.

### Michelle's Problems With Uber

32. Plaintiff Michelle Garcia, a motorized wheelchair user, lives in Chicago's Pilsen neighborhood. Her motorized wheelchair does not fold, will not fit in a sedan, and is too heavy to lift into a vehicle without a ramp.

33. Michelle works for Access Living as its Community Development Organizer in the Latino community. To travel from Pilsen to her Access Living workplace, Michelle uses a wheelchair-accessible taxi.

34. Michelle wants to use Uber because she has heard that it is fast, cost-effective, safe, reliable, efficient, and convenient. Michelle has a smartphone, could download and run the app, and has a credit card to pay for Uber's services.

35. But other motorized wheelchair users at Access Living have told Michelle that they are unable to use Uber's travel services because Uber lacks wheelchair accessible vehicles. Access Living colleagues have told Michelle that from its commencement of operations in 2011 until August 2015, Uber provided just 14 accessible rides in Chicago.

36. On September 29, 2016, Michelle's colleagues at Access Living showed Michelle the app, which identified just one wheelchair accessible vehicle in the City of Chicago.

37. Michelle has not downloaded the app and, as a motorized wheelchair user, believes it would be futile for her to do so.

## Rahnee's Problems With Uber

38. Plaintiff Rahnee Patrick works for Access Living as its Director of Independent Living Services.

39. Rahnee is a motorized wheelchair user who can often transfer into a standard vehicle. Her husband, Mike Ervin, is a motorized wheelchair user who needs a wheelchair accessible vehicle for transportation. Rahnee and Mike live together in Chicago.

40. Mike works at Chicago's Victory Gardens Theater as its Access Project Coordinator. During the Victory Gardens 2015-16 theater season, Uber participated with Victory

8

Gardens in the Victory Gardens Access Project, an outreach program which involves people with disabilities in all aspects of the theater.

41. As a promotion, Uber agreed to transport persons with disabilities to Victory Gardens, where they could attend plays presented in ways that are accessible to disabled individuals. As Access Project Coordinator, Mike oversees such events.

42. Mike downloaded the app, intending to use Uber's travel promotion. But Mike did not complete the application process because he recalled colleagues telling him that Uber does not accommodate motorized wheelchair users. Mike thus determined that he could not rely on Uber to get him to his job at Victory Gardens.

43. On October 11, 2016, Mike viewed a screen shot of the app taken by a colleague which showed that no wheelchair accessible vehicles were available, confirming Mike's belief that, as a motorized wheelchair user, he lacks access to Uber's travel services.

44. Rahnee wants to use Uber to travel with her husband. She owns a smartphone, can download the app, and has a credit card to pay for Uber's services. Rahnee has not downloaded the app because Uber does not provide equivalent services to Mike, a motorized wheelchair user.

## Justin's Problems With Uber

45. Plaintiff Justin Cooper, a motorized wheelchair user, is a volunteer board member at Access Living. Justin lives in Chicago's Old Town neighborhood.

46. In August 2016, Justin and an ambulatory friend ate at a restaurant on Irving Park Road in Chicago. After their meal, they wanted to travel to the Harlem Irving Plaza Mall. Because Justin had heard that Uber does not offer equivalent service to motorized wheelchair users, he concluded that he could not use Uber to access transportation to the Harlem Irving Plaza Mall. Instead, he and his friend went across the street to T.J. Maxx, and then went home.

47. Justin concluded that Uber was unavailable to persons requiring wheelchair accessible vehicles because he knew of the unsuccessful effort to pass a Chicago ordinance requiring Uber to provide a minimum number of wheelchair accessible vehicles, with equivalent response times and fares. Access Living staff who advocated for that ordinance also informed Justin that Uber was lobbying to be free of a requirement that it provide equivalent service to persons like him, who need wheelchair accessible vehicles.

48. On October 10, 2016, Justin viewed the app from an Access Living staff member's phone. The app reflected that at 1:04 p.m. that day, there were no wheelchair accessible vehicles available through Uber.

49. Justin wants to use Uber. He has a smartphone to download and run the app, and a credit card to pay for Uber's services. Justin has not downloaded the app because he believes that Uber does not provide equivalent access to motorized wheelchair users.

## Access Living's Problems With Uber

50. Under Title VII of the Rehabilitation Act, 29 U.S.C § 794, and 29 U.S.C. § 796f-4, Access Living operates as a Center for Independent Living, a consumer-controlled, community-based, cross-disability, nonresidential private nonprofit agency designed and operated within a local community by individuals with disabilities and providing an array of independent living services.

51. The ADA defines an individual disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102 (1)(A). As a Center for Independent Living, Access Living must ensure, under 29 U.S.C. § 796f-4(c)(6), that a majority of its staff, and individuals in decision-making positions are individuals with disabilities. Access Living is governed and staffed by a majority of persons with disabilities.

Fourteen percent of Access Living's staff use motorized wheelchairs, and 20 percent of its board members use motorized wheelchairs or cannot transfer from their manual chair.

52. Title VII of the Rehabilitation Act and 29 U.S.C. § 705(17)(D) require that Access Living's independent core services include "individual and systems advocacy." That requires Access Living to advocate a philosophy of independent living, including promoting "equal access for individuals with significant disabilities, within their communities to society and to all services, programs, activities, resources, and facilities, whether public or private and regardless of the funding source." 29 U.S.C. § 796f-4(b)(1)(D).

53. To meet this requirement, Access Living advocates for travel services that are fully accessible to persons with disabilities. In 1984—before the ADA was enacted—an Access Living board member and ADAPT sued the CTA and won installation of bus lifts and other modifications to make buses accessible to mobility-impaired passengers. In 2001, the CTA resolved a second Access Living lawsuit by installing audio-visual equipment to announce stops and transportation information; rehabilitating 20 of its oldest elevators at train stations; deploying "gap fillers" to allow wheelchair users to board the elevated train system; and adding staff to aid disabled passengers stranded at bus stops or train stations.

54. Access Living has also campaigned to ensure that taxis are available to disabled individuals. In 2012, that campaign resulted in a City of Chicago ordinance requiring that five percent of cabs in fleets of 20 vehicles or more be wheelchair-accessible, and that there be a central dispatch for wheelchair-accessible cabs. Further advocacy led to additional ordinances increasing requirements in the number of wheelchair-accessible cabs: 10 percent of fleets by 2018; 25 percent by 2022; and 50 percent by 2030.

55. Uber's exceptional success in the market is rapidly supplanting the more traditional forms of transportation that Access Living has fought to make accessible to motorized wheelchair users. As of January, 2016, 524 Chicago Taxi medallions had been surrendered, 97 medallions were in foreclosure, and 6,222 taxis were in operation in the City of Chicago, down from 6,899 taxis in 2013.

56. By comparison, in Chicago, Uber provided: (a) 1,695,413 rides in April 2015; (b) 1,865,720 rides in May 2015, and (c) 1,935,253 rides in June 2015. Yet, from September 2011—when it began operating in Chicago—until August 2015, Uber provided just 14 rides to motorized wheelchair users requiring wheelchair accessible vehicles.

57. Beginning in March of 2016, Access Living, with a coalition of other organizations, advocated for an amendment to the City of Chicago's ordinance to require companies like Uber to provide equivalent service for individuals who use wheelchair accessible vehicles. Uber campaigned aggressively against the proposed amendment. All mention of equivalent service was removed from the ordinance that eventually passed.

58. After that advocacy effort failed, on August 3, 2016, high-level Access Living and Uber staff met to discuss accessibility. Uber's staff demonstrated their app to show the number of wheelchair accessible vehicles then operating, but no vehicles were available in the greater Chicago metropolitan area. Access Living asked that Uber provide people requiring wheelchair accessible vehicles with equivalent service. Uber responded that it had no intention of providing equivalent response times.

59. Uber's denial of equivalent travel services to motorized wheelchair users and others frustrates Access Living's performance of its mission of empowering persons with disabilities to live independently, and requires Access Living to divert resources and incur

increased costs to transport its staff and board members who use motorized wheelchairs or cannot transfer from their manual chair, all of whom lack equivalent access to Uber's travel options.

### Relevant Provisions of the ADA

60. Title III of the ADA governs public accommodations provided by private entities and protects individuals from discrimination on the basis of disability in the services provided: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C., § 12182(a). Title III defines the term "public accommodation" to include "travel service." *Id.* § 12181(7)(F).

61. It is discrimination under Title III to subject "an individual or class of individuals on the basis of a disability" to "a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i).

62. It is discrimination under Title III to afford to disabled persons "the opportunity to participate in or benefit from" a service, facility, advantage, or accommodation "that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(b)(1)(A)(ii).

63. It is discrimination under Title III to "exclude or otherwise deny" equal services, facilities, advantages, or accommodations "to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E).

64. It is discrimination under Title III to apply "standards or criteria or methods of administration" that "have the effect of discriminating on the basis of disability" or "that perpetuate the discrimination of others who are subject to common administrative control." 42 U.S.C. § 12182(b)(1)(D).

65. It is discrimination under Title III to fail to "make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).

66. Besides travel services, Title III regulates demand responsive systems. A demand responsive system is "any system of providing transportation of individuals by a vehicle, other than a system which is a fixed route system." 42 U.S.C. § 12181(3).

67. Title III discrimination includes "a failure of a private entity which operates a demand responsive system and which is not subject to section 12184 of this title to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities." 42 U.S.C. § 12182(b)(2)(C)(i).

68. A demand responsive service, "when viewed in its entirety, shall be deemed to provide equivalent service if the service available to individuals with disabilities, including individuals who use wheelchairs," is provided "in the most integrated setting appropriate to the needs of the individual," and "is equivalent to the service provided other individuals" for response time; fares; geographic area of service; hours and days of service; availability of

information; reservations capability; any constraints on capacity or service availability; and restrictions priorities based on trip purpose. 49 C.F.R. § 37.105.

69. Title III forbids discrimination against individuals on the basis of disability "in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a).

70. Title III thus requires a private entity primarily engaged in providing specified public transportation services to make reasonable modifications to fully accommodate individuals with disabilities, so they get service that is equivalent to the service provided to non-disabled persons. 42 U.S.C. § 12184(b)(2)(A). The failure of such an entity "to make such reasonable accommodations in policies, practices, or procedures when such modifications are necessary to afford such . . . services . . . to individuals with disabilities" is discriminatory unless the entity can demonstrate that making such modifications would "fundamentally alter" the nature of such services. *Id.* § 12182(b)(2)(A)(ii).

71. Title III empowers persons aggrieved by ADA violations to bring civil actions for preventive relief, including temporary and permanent injunctive relief, and for an award of reasonable attorney fees as part of their costs if they prevail. 42 U.S.C. §§ 2000a-3, 12188(a).

### Uber's Continuing Violations of the ADA

72. Since September 2011, and continuing through today, Uber has operated a travel service in Chicago that failed to provide equivalent service to individuals who require wheelchair accessible vehicles and continues to refuse to provide equivalent service to that group.

73. An actual controversy exists as to whether Uber is subject to the provisions of the ADA with respect to providing equivalent travel services to motorized wheelchair users and

those who require wheelchair accessible vehicles. Plaintiffs posit that Uber is subject to the ADA and discriminates against motorized wheelchair users and those who require wheelchair accessible vehicles by denying them equivalent access to Uber's travel services. Uber contends that it is exempt from the ADA.

74. Uber operates a travel service and a public accommodation in the City of Chicago. 42 U.S.C. § 12181(7)(F).

75. Uber operates a demand responsive system in the City of Chicago. 42 U.S.C. § 12181(3).

76. Uber's denial of travel services to motorized wheelchair users that is equivalent to the travel services it provides to UberX users constitutes discrimination under Title III of the ADA, 42 U.S.C. §§ 12182(a), 12182(b)(1)(A)(i), 12182(b)(1)(A)(ii), 12181(b)(1)(d), 12182(b)(1)(E), 12182(b)(2)(A)(ii), and 12182(b)(2)(C)(i).

77. 29 U.S.C. § 796f-4(c)(6) requires Access Living to ensure that a majority of its staff and individuals in decision-making positions are individuals with disabilities. A majority of Access Living's employees and decision-makers are disabled. Fourteen percent of Access Living's staff are motorized wheelchair users and 20 percent of its board members either use motorized wheelchairs or cannot transfer into standard vehicles from their wheelchair. These individuals are denied equivalent access to Uber's travel services.

78. Uber's continuing discrimination under the ADA compels Access Living to divert its resources to transport those of its employees who are motorized wheelchair users or cannot transfer from their wheelchair, and are denied equivalent access to Uber's travel services.

79. 29 U.S.C. § 796f-4(b)(1)(D) requires Access Living to advocate for the equal access of individuals with significant disabilities to all public or private services, resources, and activities.

80. Uber's continuing discrimination under the ADA threatens Access Living's fulfillment of its core mission to advance the civil rights of disabled persons and foster their ability to living independently.

81. There is a causal relation between Uber's continuing discrimination under the ADA, and Access Living's ability to perform, and devote its resources toward, its mission. It is likely that a favorable judicial decision for Plaintiffs in this case will remediate and prevent these injuries.

82. Michelle, Rahnee, and Justin are disabled within the meaning of the ADA, 42 U.S.C. § 12102.

83. Rahnee is also known to associate with a person with a disability, as provided under Title III of the ADA, 42 U.S.C. § 12182(b)(1)(E).

84. Michelle, Rahnee, and Justin want to use Uber for future travel, but are deterred in doing so because: (a) Defendants operate their public accommodation so as to deny motorized wheelchair users and those unable to transfer from their wheelchair the opportunity to benefit from Uber's services, 42 U.S.C. § 12182(b)(1)(A)(i); (b) Defendants operate their public accommodation so as to provide motorized wheelchair users and those unable to transfer from their wheelchair a service that is not equal to that afforded to other individuals, *id.* § 12182(b)(1)(A)(ii); (c) Defendants use standards or criteria or methods of administration that discriminate on the basis of disability against motorized wheelchair users and those unable to transfer from their wheelchair, *id.* § 12182(b)(1)(D), and (d) Defendants operate their system in a

manner fails to provide to motorized wheelchair users and those unable to transfer from their wheelchair service that is equivalent to the service it provides to individuals without disabilities, *id.* § 12182(2)(C)(i).

85. There is a causal relation between Uber's continuing discrimination under the ADA and the inability of Michelle, Rahnee, and Justin to use Uber for future travel. It is likely that a favorable judicial decision in this case for Plaintiffs will prevent further discrimination against Michelle, Rahnee, and Justin, and enable their use of Uber going forward.

WHEREFORE, Plaintiffs request that the Court:

A. Declare that: (1) Uber is a public accommodation under the ADA, (2) Uber operates a travel service under the ADA, (3) the ADA requires Uber to provide equivalent services to persons disabled within the meaning of the ADA, including motorized wheelchair users and those who cannot transfer from their wheelchair into a traditional vehicle, (4) Uber is not providing equivalent services in the City of Chicago to motorized wheelchair users and those who are unable to transfer from their wheelchair, and (5) Uber is thus in violation of the ADA;

B. Permanently enjoin Defendants from discriminating against motorized wheelchair users and those who cannot transfer from their wheelchair into a traditional vehicle, and require them to provide service to all such individuals that is equivalent to the service provided to non-disabled individuals taking into account cost of use, response time, geographic area of service, availability of service, availability of information, reservations capability, constraints on capacity or service availability, and restrictions priorities based on trip purpose; and

C. Award Plaintiffs their reasonable costs and attorney fees.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all issues so triable.

Dated: October 13, 2016

Respectfully submitted,

/s/ *Steven P. Blonder*
Steven P. Blonder (sblonder@muchshelist.com)
Jonathan L. Loew (jloew@muchshelist.com)
Thomas C. Koessl (tkoessl@muchshelist.com)
Much Shelist, P.C.
191 North Wacker Drive
Suite 1800
Chicago, Illinois 60606-2000
Ph. 312-521-2402

and

Charles R. Petrof (cpetrof@accessliving.org)
Access Living of Metropolitan Chicago
115 W. Chicago Ave.
Chicago, Illinois 60654
Ph. (312) 640-2124
TTY: (312) 640-2169

Counsel for Plaintiffs