**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ACCESS LIVING OF METROPOLITAN CHICAGO, a not-for-profit corporation; MICHELLE GARCIA; RAHNEE PATRICK; and JUSTIN COOPER,**<br><br>Plaintiff,<br><br>v.<br><br>**UBER TECHNOLOGIES, INC., a corporation; and RASIER, LLC,**<br><br>Defendants. | No. 16-cv-9690<br><br>Honorable Manish S. Shah<br><br>Magistrate Jeffrey T. Gilbert |

## DEFENDANTS' ANSWER AND
## DEFENSES TO PLAINTIFFS' COMPLAINT

Defendants UBER TECHNOLOGIES, INC. ("Uber"), AND RASIER, LLC ("Rasier") (collectively "Defendants"), by and through their attorneys, LITTLER MENDELSON, P.C., for their answer and defenses to Plaintiffs' Complaint, state as follows:

## BACKGROUND

1.     Uber offers a travel service that is unusable for people who require wheelchair accessible vehicles.  From Uber's start in Chicago in 2011 until August 2015 (the last period for which information is publicly available), it provided only 14 accessible rides despite an overall industry volume at that time of three million rides a month.

**ANSWER:**     Defendants deny the allegations in Paragraph 1 of Plaintiffs' Complaint.

2.     Transportation access is a central civil rights issue for people with disabilities.  In 1978 in Denver, the lack of accessible transportation led a group of wheelchair users to block buses with their own bodies to protest the buses' inaccessibility.  That protest grew to a national movement with the formation of ADAPT, a national disability rights organization, in 1983. Access Living joined with ADAPT to secure lifts on Chicago Transit Authority ("CTA") buses in 1989. Eventually this movement combined with others to achieve passage of the Americans with Disabilities Act ("ADA"), with its guarantee of full participation in all aspects of society and the end of the historical isolation and segregation of people with disabilities.

**ANSWER:** Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 2 of Plaintiffs' Complaint and therefore deny the same.

3. Uber and similar companies are now a significant part of our national transportation system and are positioning themselves to be an indispensable part of the transportation systems of the future. Uber claims its services are not subject to the ADA, and its service to people who require wheelchair accessible vehicles ranges from token to non-existent. That position threatens a return to the isolation and segregation that the disability rights movement has fought to overcome. This action seeks a declaration that the ADA requires Uber to provide equal access to people with disabilities, and to require that Uber provide service to those who require wheelchair accessible vehicles.

**ANSWER:** Defendants admit that Plaintiffs are seeking a declaration that the ADA requires Uber to provide equal access to people with disabilities and requires that Uber provide services to those who require wheelchair accessible vehicles. Defendants deny the remaining allegations in Paragraph 3 of Plaintiffs' Complaint.

## OVERVIEW OF THE CASE

4. In 1990, when Congress passed the ADA, it embraced a national mandate to eliminate discrimination against persons with disabilities, including discrimination in travel services.

**ANSWER:** Defendants admit the allegations in Paragraph 4 of Plaintiffs' Complaint.

5. Uber offers access to travel services for persons in Chicago. Uber characterizes its travel services as cost-effective, convenient, widely-available, timely, reliable, efficient, and safe. Users request transportation through Uber's mobile software application ("app"), and Uber arranges rides between passengers and a fleet of drivers. Uber does not own the vehicles in this fleet. Instead, it maintains control over the cost, the vehicle, the driver qualifications, and the general ride experience for each trip. Uber and similar providers are rapidly supplanting traditional taxi and other transportation services and becoming a primary option for on-demand transportation.

**ANSWER:** Defendants deny that Uber offers access to travel services or travel services, and that Uber is rapidly supplanting traditional taxi and other transportation services and becoming a primary option for on-demand transportation. Defendants also deny that Uber

maintains control over the cost, the vehicle, the driver qualifications, and the general ride experience for each trip.  Defendants admit the remaining allegations in Paragraph 5 of Plaintiffs' Complaint.

6.      In violation of the ADA, Uber does not offer equivalent access to its travel service to Chicago motorized wheelchair users and other mobility-device users who cannot transfer into traditional vehicles.  Plaintiffs bring this action to force Uber to end its discrimination against these users.

**ANSWER:**     Defendants deny the allegations in Paragraph 6 of Plaintiffs' Complaint.

7.      Motorized wheelchairs are used by persons with disabilities who cannot use a manual wheelchair.  Motorized wheelchairs [sic] users may require motorized aids for lack of arm strength, lack of upper body strength, or lack of coordination to operate a manual wheelchair.

**ANSWER:**     Defendants lack sufficient information to form a belief as to whether unknown motorized wheelchair users may require motorized aids and therefore deny the same. Defendants admit the remaining allegations in Paragraph 7 of Plaintiffs' Complaint.

8.      Motorized wheelchairs are heavy and do not fit into the trunk of a car.  Those who use them require wheelchair accessible vehicles with ramps and lifts to accommodate motorized wheelchairs.  Wheelchair accessible vehicles are widely used and readily available.

**ANSWER:**     Defendants deny that wheelchair accessible vehicles are "widely used and readily available."  Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 8 of Plaintiffs' Complaint and therefore deny the same.

9.      Access Living is a not-for-profit cross-disability advocacy organization in Chicago.  Its mission is to protect and advance the civil rights of individuals with disabilities and encourage their ability to live independently.  Access Living performs its mission by offering peer-oriented independent living services, public education programs, individualized and systemic advocacy, and by enforcing civil rights on behalf of disabled persons.

**ANSWER:**     Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 9 of Plaintiffs' Complaint and therefore deny the same.

10.     As required by 29 U.S.C. § 796f-4(c)(6), Access Living is governed and staffed by a majority of people with disabilities within the meaning of the ADA. Fourteen percent of Access Living's employees use motorized wheelchairs, and 20 percent of its board members either use motorized wheelchair or cannot transfer to a standard vehicle from their wheelchairs. All these individuals lack equivalent access to Uber's travel services. When Access Living transports those employees or board members, it must divert resources that would otherwise be used to fulfill its mission. Access Living seeks relief against Uber because: (a) it is incurring increased costs of transporting persons who lack access to Uber's travel options; and (b) Uber's denial of equivalent services to motorized wheelchair users defeats Access Living's core mission to empower persons with disabilities to live independently.

**ANSWER:**     Defendants deny that Uber does not offer equivalent services to motorized

wheelchair users. Defendants lack sufficient information to form a belief as to the truth of the

remaining allegations in Paragraph 10 of Plaintiffs' Complaint and therefore deny the same.

11.     Plaintiffs Michelle Garcia, Rahnee Patrick, and Justin Cooper are Access Living employees or volunteers who all are disabled persons within the meaning of the ADA. They are either motorized wheelchair users themselves, or they associate with motorized wheelchair users. All live in Chicago and want to use Uber. All have credit cards and smart phones and can download the app, but they are deterred from doing so because Uber does not offer equivalent access to its transportation services to motorized wheelchair users.

**ANSWER:**     Defendants lack sufficient information to form a belief as to the truth of

the allegations in Paragraph 11 of Plaintiffs' Complaint and therefore deny the same.

12.     Uber's ADA violations are ongoing. Uber representatives have long promised representatives of Access Living that Uber will include wheelchair accessible vehicles in its service in a manner that would create a viable service, but Uber has not created even a viable service, let alone a service equivalent to that enjoyed by non-disabled individuals. Uber's discrimination against motorized wheelchair users thus persists. Plaintiffs seek: (a) a declaration that the ADA requires Uber to provide equivalent services to motorized wheelchair users and others who cannot transfer into traditional vehicles, and Uber violates the ADA by not doing so; (b) an order requiring Uber to provide service to motorized wheelchair users that is equivalent to the service it provides to general public, taking into account cost of use, response time, geographic area of service, availability of service, availability of information, reservations capability, and similar factors; and (c) recovery of their reasonable attorney fees and costs.

**ANSWER:**     Defendants deny the allegations in Paragraph 12 of Plaintiffs' Complaint

and deny that Plaintiffs are entitled to any relief.

## PARTIES

13.     Plaintiff Access Living is a not-for-profit corporation in Chicago, Illinois.

**ANSWER:**     Defendants admit the allegations in Paragraph 13 of Plaintiffs' Complaint.


14.     Plaintiff Michelle Garcia lives in Chicago and is a person with a disability within the meaning of the ADA, 42 U.S.C. § 12102.

**ANSWER:**     Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 14 of Plaintiffs' Complaint and therefore deny the same.


15.     Plaintiff Rahnee Patrick lives in Chicago and is a person with a disability within the meaning of the under the ADA, 42 U.S.C. § 12102.

**ANSWER:**     Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 15 of Plaintiffs' Complaint and therefore deny the same.


16.     Plaintiff Justin Cooper lives in Chicago and is a person with a disability under the ADA, 42 U.S.C. § 12102.

**ANSWER:**     Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 16 of Plaintiffs' Complaint and therefore deny the same.


17.     Defendant Uber Technologies, Inc. is a for-profit company headquartered in California. Uber provides access to travel services to individuals in Chicago.

**ANSWER:**     Defendants deny that Uber provides access to travel services.  Defendants admit the remaining allegations in Paragraph 17 of Plaintiffs' Complaint.


18.     Defendant Rasier, LLC, is a for-profit Delaware corporation with headquarters in California. Rasier holds the Transportation Network Provider license that the City of Chicago requires for Uber to operate its travel services in Chicago.

**ANSWER:**     Defendants admit the allegations in Paragraph 18.


## JURISDICTION AND VENUE

19. The Court has subject matter jurisdiction under: (a) 28 U.S.C. § 1331, which grants district courts original jurisdiction of all civil actions arising under the laws of the United States; and (b) 28 U.S.C. § 1343(a)(4), which grants district courts original jurisdiction of any civil action to redress or secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

**ANSWER:** Defendants admit that this Court has subject matter jurisdiction over matters such as this but deny discriminating against Plaintiffs in any way. Defendants deny that this Court has jurisdiction over those Plaintiffs or members of Access Living who have downloaded Uber's app and signed up to use Uber, as those members are bound by Uber's arbitration agreement.

20. Venue is proper under 28 U.S.C. § l391(b). The events or omissions giving rise to this action occurred in the Northern District of Illinois.

**ANSWER:** Defendants deny that they are violating the ADA or discriminating against Plaintiffs in any way. Defendants further deny that venue is proper as to those Plaintiffs or members of Access Living who have downloaded Uber's app and signed up to use Uber, as those members are bound by Uber's arbitration agreement. Defendants admit the remaining allegations in Paragraph 20 of Plaintiffs' Complaint.

## UBER'S SERVICES

21. In Chicago, Uber calls its primary service UberX. Uber operates other services under the names UberXL, UberSELECT, UberBLACK, and UberWAV, which primarily differ from UberX in the model of vehicle dispatched by Uber. UberX and these other services are available to customers with a smartphone who download the app, open an Uber account, and register a credit card to pay for their rides.

**ANSWER:** Defendants deny that Uber dispatches vehicles. Defendants admit the allegations in Paragraph 21 of Plaintiffs' Complaint.

22. Uber also offers UberASSIST, which provides help boarding vehicles, and UberPOOL, which operates like UberX but allows riders with similar trips to travel as a carpool.

**ANSWER:** Defendants deny that Uber provides vehicles. Defendants admit the remaining allegations in Paragraph 22 of Plaintiffs' Complaint.

23. Finally, Uber offers UberTAXI, which is nothing like Uber's other services. UberTAXI is simply a referral to Chicago's taxi dispatch service to request a licensed taxi.

**ANSWER:** Defendants admit the allegations in Paragraph 23 of Plaintiffs' Complaint.

24. Except for UberTAXI, Uber controls all aspects of its travel service. Uber uses a formula to fix the total charge that passengers pay, taking into account the passenger's pickup and drop off locations, a base fare, a per-minute-of-travel fare, and a per-mile-of-travel fare. Uber also fixes temporary price increases for passengers, known as "surge pricing." Surge pricing increases the cost of travel at time periods which Uber chooses. Neither the passenger nor the driver negotiates the cost of travel. Uber insures the rides it provides to its passengers.

**ANSWER:** Defendants deny the allegations in Paragraph 24 of Plaintiffs' Complaint.

25. Except for UberTAXI, Uber decides the type and maximum age of car used for each of its services. For example, Uber requires a four-door sedan for UberX travel, inspects vehicles used for UberX travel, and permits only those vehicles passing its inspection to be used for UberX travel. Uber arranges with companies to lease Uber-approved vehicles to UberX drivers.

**ANSWER:** Defendants deny the allegations in Paragraph 25 of Plaintiffs' Complaint.

26. Except for UberTAXI, Uber controls the type of driver that serves its users. Uber has minimum requirements for its drivers' age, experience, licensing, and driving records. Uber conducts criminal background checks on drivers, and operates its own system for deciding which drivers it will use to transport Uber passengers.

**ANSWER:** Defendants deny the allegations in Paragraph 26 of Plaintiffs' Complaint.

27. Except for UberTAXI, Uber assigns the driver for each trip request, and can deactivate drivers who too often cancel the rides that Uber assigns them.

**ANSWER:** Defendants admit that Uber can deactivate drivers pursuant to the drivers' contracts with Uber, but Defendants deny the remaining allegations in Paragraph 27 of Plaintiffs' Complaint.

28.     Except for UberTAXI, Uber oversees the quality of the Uber ride experience. Uber uses a driver rating system to rate Uber drivers. On information and belief, a driver rating of 4.5 out of 5 can cause Uber to deactivate a driver. Uber maintains community guidelines and will deactivate drivers who violate those guidelines. Uber advises its drivers to keep bottled water, candy, phone chargers, vomit bags, cleaning cloths, and cleaning spray on hand for customers. Uber tells its drivers to offer customers the opportunity to select the radio station of their choice. Uber uses the driver rating system to enforce vehicle cleanliness requirements. Uber also uses a passenger rating system to decide if a passenger will not be allowed to use Uber's travel services.

**ANSWER:**     Defendants deny the allegations in Paragraph 28 of Plaintiffs' Complaint.


29.     UberX is virtually unavailable to motorized wheelchair users and manual wheelchair users who cannot transfer into a car. For them, Uber primarily uses UberTAXI, which refers such persons to an independent taxi service with wheelchair accessible vehicles. Uber receives a fee for the referral to and collecting the fare for the independent taxi service. On information and belief, UberTAXI is a small part of Uber's business in Chicago.

**ANSWER:**     Defendants deny the allegations in Paragraph 29 of Plaintiffs' Complaint.


30.     For UberTAXI, unlike the rest of Uber's services, Uber does not regulate the cost of travel, the type of vehicle used, the driver, the convenience to the passenger, the timeliness and efficiency of the transportation service, or the quality of the passenger's experience.

**ANSWER:**     Defendants deny that Uber regulates the cost of travel, the type of vehicle used, the driver, the convenience to the passenger, the timeliness and efficiency of the transportation service, or the quality of the passenger's experience.  Defendants admit the remaining allegations in Paragraph 30 of Plaintiffs' Complaint.


31.     UberTAXI does not offer its passengers service that is equivalent to Uber's primary service, UberX.

**ANSWER:**     Defendants deny the allegations in Paragraph 31 of Plaintiffs' Complaint.


## MICHELLE'S PROBLEMS WITH UBER

32.     Plaintiff Michelle Garcia, a motorized wheelchair user, lives in Chicago's Pilsen neighborhood. Her motorized wheelchair does not fold, will not fit in a sedan, and is too heavy to lift into a vehicle without a ramp.

**ANSWER:**    Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 32 of Plaintiffs' Complaint and therefore deny the same.

33.    Michelle works for Access Living as its Community Development Organizer in the Latino community. To travel from Pilsen to her Access Living workplace, Michelle uses a wheelchair-accessible taxi.

**ANSWER:**    Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 33 of Plaintiffs' Complaint and therefore deny the same.

34.    Michelle wants to use Uber because she has heard that it is fast, cost-effective, safe, reliable, efficient, and convenient. Michelle has a smartphone, could download and run the app, and has a credit card to pay for Uber's services.

**ANSWER:**    Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 34 of Plaintiffs' Complaint and therefore deny the same.

35.    But other motorized wheelchair users at Access Living have told Michelle that they are unable to use Uber's travel services because Uber lacks wheelchair accessible vehicles. Access Living colleagues have told Michelle that from its commencement of operations in 2011 until August 2015, Uber provided just 14 accessible rides in Chicago.

**ANSWER:**    Defendants deny that from its commencement of operations in 2011 until August 2015 Uber has provided just 14 accessible rides in Chicago.  Defendants also deny that Uber lacks wheelchair accessible vehicles.  Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 35 of Plaintiffs' Complaint and therefore deny the same.

36.    On September 29, 2016, Michelle's colleagues at Access Living showed Michelle the app, which identified just one wheelchair accessible vehicle in the City of Chicago.

**ANSWER:**    Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 36 of Plaintiffs' Complaint and therefore deny the same.  Answering

further, Defendants deny that Uber provides access to just one wheelchair accessible vehicle in the City of Chicago.

37. Michelle has not downloaded the app and, as a motorized wheelchair user, believes it would be futile for her to do so.

**ANSWER:** Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 37 of Plaintiffs' Complaint and therefore deny the same.

### RAHNEE'S PROBLEMS WITH UBER

38. Plaintiff Rahnee Patrick works for Access Living as its Director of Independent Living Services.

**ANSWER:** Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 38 of Plaintiffs' Complaint and therefore deny the same.

39. Rahnee is a motorized wheelchair user who can often transfer into a standard vehicle. Her husband, Mike Ervin, is a motorized wheelchair user who needs a wheelchair accessible vehicle for transportation. Rahnee and Mike live together in Chicago.

**ANSWER:** Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 39 of Plaintiffs' Complaint and therefore deny the same.

40. Mike works at Chicago's Victory Gardens Theater as its Access Project Coordinator. During the Victory Gardens 2015-16 theater season, Uber participated with Victory Gardens in the Victory Gardens Access Project, an outreach program which involves people with disabilities in all aspects of the theater.

**ANSWER:** Defendants lack sufficient information to form a belief as to the truth of Plaintiffs' allegation about where Mike works and therefore denies the same. Defendants admit the remaining allegations in Paragraph 40 of Plaintiffs' Complaint.

41. As a promotion, Uber agreed to transport persons with disabilities to Victory Gardens, where they could attend plays presented in ways that are accessible to disabled individuals. As Access Project Coordinator, Mike oversees such events.

**ANSWER:** Defendants admit that Uber agreed to offer its app to individuals who needed a wheelchair accessible vehicle or extra assistance to travel to Victory Gardens. Defendants deny that they "agreed to transport persons." Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 41 of Plaintiffs' Complaint and therefore deny the same.

42.     Mike downloaded the app, intending to use Uber's travel promotion. But Mike did not complete the application process because he recalled colleagues telling him that Uber does not accommodate motorized wheelchair users. Mike thus determined that he could not rely on Uber to get him to his job at Victory Gardens.

**ANSWER:** Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 42 of Plaintiffs' Complaint and therefore deny the same.

43.     On October 11, 2016, Mike viewed a screen shot of the app taken by a colleague which showed that no wheelchair accessible vehicles were available, confirming Mike's belief that, as a motorized wheelchair user, he lacks access to Uber's travel services.

**ANSWER:** Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 43 of Plaintiffs' Complaint and therefore deny the same. Answering further, Defendants deny that motorized wheelchair users do not have the ability to access to Uber's app.

44.     Rahnee wants to use Uber to travel with her husband. She owns a smartphone, can download the app, and has a credit card to pay for Uber's services. Rahnee has not downloaded the app because Uber does not provide equivalent services to Mike, a motorized wheelchair user.

**ANSWER:** Defendants deny that Uber does not provide equivalent access to its app to motorized wheelchair users. Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 44 of Plaintiffs' Complaint and therefore deny the same.

## JUSTIN'S PROBLEMS WITH UBER

45.     Plaintiff Justin Cooper, a motorized wheelchair user, is a volunteer board member at Access Living. Justin lives in Chicago's Old Town neighborhood.

**ANSWER:**     Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 45 of Plaintiffs' Complaint and therefore deny the same.

46.     In August 2016, Justin and an ambulatory friend ate at a restaurant on Irving Park Road in Chicago. After their meal, they wanted to travel to the Harlem Irving Plaza Mall. Because Justin had heard that Uber does not offer equivalent service to motorized wheelchair users, he concluded that he could not use Uber to access transportation to the Harlem Irving Plaza Mall. Instead, he and his friend went across the street to T.J. Maxx, and then went home.

**ANSWER:**     Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 46 of Plaintiffs' Complaint and therefore deny the same.  Answering further, Defendants deny that Uber does not offer equivalent access to its app to motorized wheelchair users.

47.     Justin concluded that Uber was unavailable to persons requiring wheelchair accessible vehicles because he knew of the unsuccessful effort to pass a Chicago ordinance requiring Uber to provide a minimum number of wheelchair accessible vehicles, with equivalent response times and fares. Access Living staff who advocated for that ordinance also informed Justin that Uber was lobbying to be free of a requirement that it provide equivalent service to persons like him, who need wheelchair accessible vehicles.

**ANSWER:**     Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 47 of Plaintiffs' Complaint and therefore deny the same.

48.     On October 10, 2016, Justin viewed the app from an Access Living staff member's phone. The app reflected that at 1:04 p.m. that day, there were no wheelchair accessible vehicles available through Uber.

**ANSWER:**     Defendants lack sufficient information to form a belief as to the truth of the allegations in Paragraph 48 of Plaintiffs' Complaint and therefore deny the same.

49.     Justin wants to use Uber. He has a smartphone to download and run the app, and a credit card to pay for Uber's services. Justin has not downloaded the app because he believes that Uber does not provide equivalent access to motorized wheelchair users.

**ANSWER:**     Defendants deny that Uber does not provide equivalent access to its app to

motorized wheelchair users.  Defendants lack sufficient information to form a belief as to the

truth of the remaining allegations in Paragraph 49 of Plaintiffs' Complaint and therefore deny the

same.


## ACCESS LIVING'S PROBLEMS WITH UBER

50.     Under Title VII of the Rehabilitation Act, 29 U.S.C § 794, and 29 U.S.C. § 796f-4, Access Living operates as a Center for Independent Living, a consumer-controlled, community-based, cross-disability, nonresidential private nonprofit agency designed and operated within a local community by individuals with disabilities and providing an array of independent living services.

**ANSWER:**     Defendants lack sufficient information to form a belief as to the truth of

Plaintiff's allegations in Paragraph 50 of Plaintiffs' Complaint and therefore deny the same.


51.     The ADA defines an individual disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102 (1)(A). As a Center for Independent Living, Access Living must ensure, under 29 U.S.C. § 796f-4(c)(6), that a majority of its staff, and individuals in decision-making positions are individuals with disabilities. Access Living is governed and staffed by a majority of persons with disabilities. Fourteen percent of Access Living's staff use motorized wheelchairs, and 20 percent of its board members use motorized wheelchairs or cannot transfer from their manual chair.

**ANSWER:**     Defendants admit that the ADA defines disability with respect to an

individual as a physical or mental impairment that substantially limits one or more major life

activities of such individual.  Defendants lack sufficient information to form a belief as to the

truth of the remaining allegations in Paragraph 51 of Plaintiffs' Complaint.


52.     Title VII of the Rehabilitation Act and 29 U.S.C. § 705(17)(D) require that Access Living's independent core services include "individual and systems advocacy." That requires Access Living to advocate a philosophy of independent living, including promoting "equal access for individuals with significant disabilities, within their communities to society and

to all services, programs, activities, resources, and facilities, whether public or private and regardless of the funding source." 29 U.S.C. § 796f-4(b)(l)(D).

**ANSWER:**   Defendants lack sufficient information to form a belief as to the truth of

the remaining allegations in Paragraph 52 of Plaintiffs' Complaint.


53.    To meet this requirement, Access Living advocates for travel services that are fully accessible to persons with disabilities. In 1984-before the ADA was enacted-an Access Living board member and ADAPT sued the CTA and won installation of bus lifts and other modifications to make buses accessible to mobility-impaired passengers. In 2001, the CTA resolved a second Access Living lawsuit by installing audio-visual equipment to announce stops and transportation information; rehabilitating 20 of its oldest elevators at train stations; deploying "gap fillers" to allow wheelchair users to board the elevated train system; and adding staff to aid disabled passengers stranded at bus stops or train stations.

**ANSWER:**   Defendants lack sufficient information to form a belief as to the truth of

the allegations in Paragraph 53 of Plaintiffs' Complaint and therefore deny the same.


54.    Access Living has also campaigned to ensure that taxis are available to disabled individuals. In 2012, that campaign resulted in a City of Chicago ordinance requiring that five percent of cabs in fleets of 20 vehicles or more be wheelchair-accessible, and that there be a central dispatch for wheelchair-accessible cabs. Further advocacy led to additional ordinances increasing requirements in the number of wheelchair-accessible cabs: 10 percent of fleets by 2018; 25 percent by 2022; and 50 percent by 2030.

**ANSWER:**   Defendants lack sufficient information to form a belief as to the

allegations in Paragraph 54 of Plaintiffs' Complaint and therefore deny the same.


55.    Uber's exceptional success in the market is rapidly supplanting the more traditional forms of transportation that Access Living has fought to make accessible to motorized wheelchair users. As of January, 2016, 524 Chicago Taxi medallions had been surrendered, 97 medallions were in foreclosure, and 6,222 taxis were in operation in the City of Chicago, down from 6,899 taxis in 2013.

**ANSWER:**   Defendants deny that Uber is rapidly supplanting traditional forms of

transportation.  Defendants lack sufficient information to form a belief as to the truth of the

remaining allegations in Paragraph 55 of Plaintiffs' Complaint and therefore deny the same.

56.     By comparison, in Chicago, Uber provided: (a) 1,695,413 rides in April 2015; (b) 1,865,720 rides in May 2015, and (c) 1,935,253 rides in June 2015. Yet, from September 2011- when it began operating in Chicago-until August 2015, Uber provided just 14 rides to motorized wheelchair users requiring wheelchair accessible vehicles.

**ANSWER:**     Defendants deny the allegations in Paragraph 56 of Plaintiffs' Complaint.


57.     Beginning in March of 2016, Access Living, with a coalition of other organizations, advocated for an amendment to the City of Chicago's ordinance to require companies like Uber to provide equivalent service for individuals who use wheelchair accessible vehicles. Uber campaigned aggressively against the proposed amendment. All mention of equivalent service was removed from the ordinance that eventually passed.

**ANSWER:**     Defendants deny that Uber does not provide equivalent access to its app

for individuals who use wheelchair accessible vehicles.  Defendants lack sufficient information

to form a belief as to the remaining allegations in Paragraph 57 and therefore deny the same.


58.     After that advocacy effort failed, on August 3, 2016, high-level Access Living and Uber staff met to discuss accessibility. Uber's staff demonstrated their app to show the number of wheelchair accessible vehicles then operating, but no vehicles were available in the greater Chicago metropolitan area. Access Living asked that Uber provide people requiring wheelchair accessible vehicles with equivalent service. Uber responded that it had no intention of providing equivalent response times.

**ANSWER:**     Defendants admit the allegations in Paragraph 58.


59.     Uber's denial of equivalent travel services to motorized wheelchair users and others frustrates Access Living's performance of its mission of empowering persons with disabilities to live independently, and requires Access Living to divert resources and incur increased costs to transport its staff and board members who use motorized wheelchairs or cannot transfer from their manual chair, all of whom lack equivalent access to Uber's travel options.

**ANSWER:**     Defendants deny the allegations in Paragraph 59 of Plaintiffs' Complaint.


## RELEVANT PROVISIONS OF THE ADA

60.     Title III of the ADA governs public accommodations provided by private entities and protects individuals from discrimination on the basis of disability in the services provided: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a

place of public accommodation." 42 U.S.C., § 12182(a). Title III defines the term "public accommodation" to include "travel service." *Id.* § 12181(7)(F).

**ANSWER:**    Defendants admit the allegations in Paragraph 60 of Plaintiffs' Complaint, but Defendants deny violating Title III of the ADA in any way.

61.    It is discrimination under Title III to subject "an individual or class of individuals on the basis of a disability" to "a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(l)(A)(i).

**ANSWER:**    Defendants admit the allegations in Paragraph 61 of Plaintiffs' Complaint, but Defendants deny violating Title III of the ADA in any way.

62.    It is discrimination under Title III to afford to disabled persons "the opportunity to participate in or benefit from" a service, facility, advantage, or accommodation "that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(b)(l)(A)(ii).

**ANSWER:**    Defendants admit the allegations in Paragraph 62 of Plaintiffs' Complaint, but Defendants deny violating Title III of the ADA in any way.

63.    It is discrimination under Title III to "exclude or otherwise deny" equal services, facilities, advantages, or accommodations "to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(l)(E).

**ANSWER:**    Defendants admit the allegations in Paragraph 63 of Plaintiffs' Complaint, but Defendants deny violating Title III of the ADA in any way.

64.    It is discrimination under Title III to apply "standards or criteria or methods of administration" that "have the effect of discriminating on the basis of disability" or "that perpetuate the discrimination of others who are subject to common administrative control." 42 U.S.C. § 12182(b)(l)(D).

**ANSWER:**    Defendants admit the allegations in Paragraph 64 of Plaintiffs' Complaint, but Defendants deny violating Title III of the ADA in any way.

65.     It is discrimination under Title III to fail to "make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).

**ANSWER:**     Defendants admit the allegations in Paragraph 65 of Plaintiffs' Complaint, but Defendants deny violating Title III of the ADA in any way.

66.     Besides travel services, Title III regulates demand responsive systems. A demand responsive system is "any system of providing transportation of individuals by a vehicle, other than a system which is a fixed route system." 42 U.S.C. § 12181(3).

**ANSWER:**     Defendants admit the allegations in Paragraph 66 of Plaintiffs' Complaint, but Defendants deny operating a demand responsive system.

67.     Title III discrimination includes "a failure of a private entity which operates a demand responsive system and which is not subject to section 12184 of this title to operate such system so that, when viewed in its entirety, such system ensures a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities." 42 U.S.C. § 12182(b)(2)(C)(i).

**ANSWER:**     Defendants admit the allegations in Paragraph 67 of Plaintiffs' Complaint, but Defendants deny violating Title III of the ADA in any way.

68.     A demand responsive service, "when viewed in its entirety, shall be deemed to provide equivalent service if the service available to individuals with disabilities, including individuals who use wheelchairs," is provided "in the most integrated setting appropriate to the needs of the individual," and "is equivalent to the service provided other individuals" for response time; fares; geographic area of service; hours and days of service; availability of information; reservations capability; any constraints on capacity or service availability; and restrictions priorities based on trip purpose. 49 C.F.R. § 37.105.

**ANSWER:**     Defendants admit the allegations in Paragraph 68 of Plaintiffs' Complaint, but Defendants deny violating Title III of the ADA in any way.

69.     Title III forbids discrimination against individuals on the basis of disability "in the full and equal enjoyment of specified public transportation services provided by a private entity

that is primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a).

**ANSWER:**   Defendants admit the allegations in Paragraph 69 of Plaintiffs' Complaint,

but Defendants deny violating Title III of the ADA in any way.

70.    Title III thus requires a private entity primarily engaged in providing specified public transportation services to make reasonable modifications to fully accommodate individuals with disabilities, so they get service that is equivalent to the service provided to non-disabled persons. 42 U.S.C. § 12184(b)(2)(A). The failure of such an entity "to make such reasonable accommodations in policies, practices, or procedures when such modifications are necessary to afford such ... services ... to individuals with disabilities" is discriminatory unless the entity can demonstrate that making such modifications would "fundamentally alter" the nature of such services. *Id*. § 12182(b)(2)(A)(ii).

**ANSWER:**   Defendants admit the allegations in Paragraph 70 of Plaintiffs' Complaint,

but Defendants deny violating Title III of the ADA in any way.

71.    Title III empowers persons aggrieved by ADA violations to bring civil actions for preventive relief, including temporary and permanent injunctive relief, and for an award of reasonable attorney fees as part of their costs if they prevail. 42 U.S.C. §§ 2000a-3, 12188(a).

**ANSWER:**   Defendants admit the allegations in Paragraph 71 of Plaintiffs' Complaint,

but Defendants deny violating Title III of the ADA in any way.

## UBER'S CONTINUING VIOLATIONS OF THE ADA

72.    Since September 2011, and continuing through today, Uber has operated a travel service in Chicago that failed to provide equivalent service to individuals who require wheelchair accessible vehicles and continues to refuse to provide equivalent service to that group.

**ANSWER:**   Defendants deny the allegations in Paragraph 72 of Plaintiffs' Complaint.

73.    An actual controversy exists as to whether Uber is subject to the provisions of the ADA with respect to providing equivalent travel services to motorized wheelchair users and those who require wheelchair accessible vehicles. Plaintiffs posit that Uber is subject to the ADA and discriminates against motorized wheelchair users and those who require wheelchair accessible vehicles by denying them equivalent access to Uber's travel services. Uber contends that it is exempt from the ADA.

**ANSWER:** Defendants deny that Uber discriminates against motorized wheelchair users and those who require wheelchair accessible vehicles. Defendants admit the remaining allegations in Paragraph 73 of Plaintiffs' Complaint.

74. Uber operates a travel service and a public accommodation in the City of Chicago. 42 U.S.C. § 12181(7)(F).

**ANSWER:** Defendants deny the allegations in Paragraph 74 of Plaintiffs' Complaint.

75. Uber operates a demand responsive system in the City of Chicago. 42 U.S.C. § 12181(3).

**ANSWER:** Defendants deny the allegations in Paragraph 75 of Plaintiffs' Complaint.

76. Uber's denial of travel services to motorized wheelchair users that is equivalent to the travel services it provides to UberX users constitutes discrimination under Title III of the ADA, 42 U.S.C. §§ 12182(a), 12182(b)(l)(A)(i), 12182(b)(l)(A)(ii), 12181(b)(l)(d), 12182(b)(1)(E), 12182(b)(2)(A)(ii), and 12182(b)(2)(C)(i).

**ANSWER:** Defendants deny the allegations in Paragraph 76 of Plaintiffs' Complaint.

77. 29 U.S.C. § 796f-4(c)(6) requires Access Living to ensure that a majority of its staff and individuals in decision-making positions are individuals with disabilities. A majority of Access Living's employees and decision-makers are disabled. Fourteen percent of Access Living's staff are motorized wheelchair users and 20 percent of its board members either use motorized wheelchairs or cannot transfer into standard vehicles from their wheelchair. These individuals are denied equivalent access to Uber's travel services.

**ANSWER:** Defendants admit that 29 U.S.C. § 796f-4(c)(6) requires Access Living to ensure that the majority of its staff and individuals in decision-making positions are individuals with disabilities. Defendants deny that any individuals are denied equivalent access to Uber's app. Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 77 of Plaintiffs' Complaint and therefore deny the same.

78. Uber's continuing discrimination under the ADA compels Access Living to divert its resources to transport those of its employees who are motorized wheelchair users or cannot transfer from their wheelchair, and are denied equivalent access to Uber's travel services.

**ANSWER:** Defendants deny the allegations in Paragraph 78 of Plaintiffs' Complaint.

79. 29 U.S.C. § 796f-4(b)(l)(D) requires Access Living to advocate for the equal access of individuals with significant disabilities to all public or private services, resources, and activities.

**ANSWER:** Defendants admit the allegations in Paragraph 79 of Plaintiffs' Complaint.

80. Uber's continuing discrimination under the ADA threatens Access Living's fulfillment of its core mission to advance the civil rights of disabled persons and foster their ability to living independently.

**ANSWER:** Defendants deny the allegations in Paragraph 80 of Plaintiffs' Complaint.

81. There is a causal relation between Uber's continuing discrimination under the ADA, and Access Living's ability to perform, and devote its resources toward, its mission. It is likely that a favorable judicial decision for Plaintiffs in this case will remediate and prevent these injuries.

**ANSWER:** Defendants deny the allegations in Paragraph 82 of Plaintiffs' Complaint.

82. Michelle, Rahnee, and Justin are disabled within the meaning of the ADA, 42 U.S.C. § 12102.

**ANSWER:** Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 82 of Plaintiffs' Complaint and therefore deny the same.

83. Rahnee is also known to associate with a person with a disability, as provided under Title III of the ADA, 42 U.S.C. § 12182(b)(1)(E).

**ANSWER:** Defendants lack sufficient information to form a belief as to the truth of the remaining allegations in Paragraph 83 of Plaintiffs' Complaint and therefore deny the same.

84. Michelle, Rahnee, and Justin want to use Uber for future travel, but are deterred in doing so because: (a) Defendants operate their public accommodation so as to deny motorized wheelchair users and those unable to transfer from their wheelchair the opportunity to benefit from Uber's services, 42 U.S.C. § 12182(b)(l)(A)(i); (b) Defendants operate their public accommodation so as to provide motorized wheelchair users and those unable to transfer from their wheelchair a service that is not equal to that afforded to other individuals, *Id.* § 12182(b)(1)(A)(ii); (c) Defendants use standards or criteria or methods of administration that

discriminate on the basis of disability against motorized wheelchair users and those unable to transfer from their wheelchair, *Id.* § 12182(b)(l)(D), and (d) Defendants operate their system in a manner fails to provide to motorized wheelchair users and those unable to transfer from their wheelchair service that is equivalent to the service it provides to individuals without disabilities, *Id.* § 12182(2)(C)(i).

**ANSWER:**   Defendants lack sufficient information to form a belief as to Plaintiffs'

allegations that Michelle, Rahnee, and Justin want to use Uber for future travel and therefore

deny the same.   Defendants deny the remaining allegations in Paragraph 84 of Plaintiffs'

Complaint.


85.    There is a causal relation between Uber's continuing discrimination under the ADA and the inability of Michelle, Rahnee, and Justin to use Uber for future travel. It is likely that a favorable judicial decision in this case for Plaintiffs will prevent further discrimination against Michelle, Rahnee, and Justin, and enable their use of Uber going forward.

**ANSWER:**   Defendants deny the allegations in Paragraph 85 of Plaintiffs' Complaint.


WHEREFORE, Plaintiffs request that the Court:

A.    Declare that: (1) Uber is a public accommodation under the ADA, (2) Uber operates a travel service under the ADA, (3) the ADA requires Uber to provide equivalent services to persons disabled within the meaning of the ADA, including motorized wheelchair users and those who cannot transfer from their wheelchair into a traditional vehicle, (4) Uber is not providing equivalent services in the City of Chicago to motorized wheelchair users and those who are unable to transfer from their wheelchair, and (5) Uber is thus in violation of the ADA;

B.    Permanently enjoin Defendants from discriminating against motorized wheelchair users and those who cannot transfer from their wheelchair into a traditional vehicle, and require them to provide service to all such individuals that is equivalent to the service provided to non-disabled individuals taking into account cost of use, response time, geographic area of service, availability of service, availability of information, reservations capability, constraints on capacity or service availability, and restrictions priorities based on trip purpose; and

C.    Award Plaintiffs their reasonable costs and attorney fees.

**ANSWER:** Defendants deny that Plaintiffs are entitled to any of their requested relief and Defendants respectfully request judgment in their favor along with their costs, attorneys' fees, expenses and any such further relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

**ANSWER:** Defendants do not request a jury trial.

## DEFENDANTS' AFFIRMATIVE AND ADDITIONAL DEFENSES

Subject to further investigation and discovery, for its defenses, including its affirmative defenses, Defendants state as follows:

1. Access Living of Metropolitan Chicago ("Access Living") has failed to allege sufficient facts to establish that it has standing to assert a violation of Title III of the Americans with Disabilities Act ("ADA") in its own right. Specifically, Access Living has failed to allege facts demonstrating that the organization has suffered an injury as a result of purported discrimination committed by Defendants.

2. Access Living has failed to state a claim upon which relief can be granted, because requiring Defendants to modify their policies, practices, or procedures in the manner identified in the Complaint would fundamentally alter the nature of Defendants' services, facilities, privileges or accommodations. Specifically, requiring Uber to implement the modifications that Defendants seek will require Uber to change its basic nature, character and purpose, which the ADA does not require.

3. Access Living lacks associational standing because it cannot seek relief on behalf of its members who have downloaded Uber's app and signed up to use Uber, as those members

are bound by Uber's arbitration agreement.  Access Living cannot abandon a portion of its membership to sue only on behalf of members not bound by Uber's arbitration agreement.  Therefore, the existence of the arbitration agreement creates the necessity of individual participation by Access Living's members, which defeats associational standing.

4.      Defendants do not provide a public transportation service or operate a taxi service within the meaning of 42 U.S.C. § 12184(a); 49 C.F.R. §§ 37.29, 37.3, 37.5, and therefore Defendants cannot be sued under the ADA.

5.      Defendants do not own, operate or lease a place of public accommodation or operate a demand responsive system within the meaning of 42 U.S.C. § 12182, and therefore Defendants cannot be sued under the ADA.

6.      Defendants allege that Access Living lacks standing to pursue the broad relief it seeks on behalf of its members given that it can only secure relief on behalf of those members not bound by arbitration agreements.  Because there are so few individual Access Living members allegedly harmed by the practices alleged who are not bound by arbitration agreements with Defendants, those individuals are better suited to pursue the recovery sought.  Alternatively, *assuming arguendo* Plaintiffs are entitled to any relief, which Defendants deny, any relief to which Access Living may be entitled is permitted only to the extent its members not bound by arbitration agreements were injured.

\*                       \*                       \*

**WHEREFORE**, Defendants Uber Technologies, Inc. and Rasier, LLC respectfully request that this Court enter an order:

A.  Entering judgment in favor of Defendants on all of Plaintiffs' claims;

B.  Dismissing Plaintiffs' Complaint with prejudice;

C.  Awarding Defendants the attorneys' fees they have incurred in defending this action;

D.  Awarding Defendants such other relief as the Court deems proper.


Respectfully submitted,

**UBER TECHNOLOGIES, INC., and
RASIER, LLC**


                    /s/ Kwabena A. Appenteng
                *One of the attorneys for Defendants*

Paul E. Bateman
Kwabena A. Appenteng
Stephanie Mills-Gallan
**LITTLER MENDELSON, P.C.**
321 North Clark Street, Suite 1000
Chicago, IL  60654
312.372.5520
*pbateman@littler.com*
*kappenteng@littler.com*
*smillsgallan@littler.com*

Dated: December 6, 2016

## <u>CERTIFICATE OF SERVICE</u>

Kwabena A. Appenteng, an attorney, hereby certifies that on December 6, 2016, he caused a copy of ***Defendants' Answer and Defenses to Plaintiffs' Complaint*** to be electronically filed with the Clerk of the U.S. District Court, Northern District of Illinois, using the CM/ECF (*electronic case filing*) system, which sent notification via electronic mail of such filing to the following ECF participant:

> Steven P. Blonder
> Jonathan L. Loew
> Thomas C. Koessl
> MUCH SHELIST, P.C.
> 191 N. Wacker Drive, Suite 1800
> Chicago, Illinois 60606
> *sblonder@muchshelist.com*
> *jloew@muchshelist.com*
> *tkoessl@muchshelist.com*
>
> Charles R. Petrof
> ACCESS LIVING OF METROPOLITAN CHICAGO
> 115 W. Chicago Avenue
> Chicago, Illinois 60654
> *cpetrof@accessliving.org*

/s/ Kwabena A. Appenteng
*One of the attorneys for Defendants*
