**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ACCESS LIVING OF METROPOLITAN CHICAGO, a not-for-profit corporation; MICHELLE GARCIA; RAHNEE PATRICK; and JUSTIN COOPER, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:16-cv-09690 |
| v. | ) ) | Judge Manish S. Shah |
| UBER TECHNOLOGIES, INC., a corporation; and RASIER, LLC, | ) ) ) | Magistrate Judge Maria Valdez |
| Defendants. | ) ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS**

**Table of Contents**

*__Page__*

INTRODUCTION ............................................................................................................ 1

ARGUMENT .................................................................................................................... 2

   I.   EQUIVALENT SERVICE IS ONE OF MANY REQUIREMENTS OF TITLE III. ........ 2

   II.  Plaintiffs Allege that Uber Violates 42 U.S.C. § 12184. .................................................... 4

       A.   As a travel service, Uber is primarily engaged in the business of transporting people. ........................................................................................................... 4

       B.   Whether Uber owns or leases vehicles does not impact Plaintiffs' allegations that Uber is liable for discrimination under section 12184. ........................................... 6

   III. PLAINTIFFS ALLEGE THAT UBER VIOLATES 42 U.S.C. § 12182. ........................ 8

       A.   Uber is a travel service and a demand responsive system under section 12182. ............................................................................................................ 9

       B.   Uber's app is a place of public accommodation that Uber owns or operates. .................................................................................................... 11

   IV. A FORMULAIC REQUEST FOR A MODIFICATION IS NOT REQUIRED .............. 13

   V.  ALL PLAINTIFFS HAVE A PRIVATE RIGHT OF ACTION ..................................... 14

CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Helping Hand, LLC v. Baltimore Co., MD,*
  515 F.3d 356 (4th Cir. 2008) ................................................15

*Aslam v Uber BV*
  [2017] I.R.L.R. 4 (28 Oct. 2016) .........................................10

*Ass'n Prof'l Elite Taxi v. Uber Sys. Spain SL,*
  Case C-434/15, ECLI:EU:C:2017:364 .................................10

*Ball v. AMC Entm't, Inc.*
  246 F. Supp. 2d 17 (D.D.C. 2003) .........................................3

*Brack v. Dart,*
  No. 11 C 8192, 2013 WL 2251741 (N.D. Ill. May 22, 2013) ..................................2

*Carparts Distrib. Center, Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.,*
  37 F.3d 12 (1st Cir. 1994) ................................................12

*Cotter v. Lyft, Inc.,*
  60 F. Supp. 3d 1067 (N.D. Cal. 2015) ................................................6, 9

*Crawford v. Uber Technologies, Inc.,*
  No. 17-CV-02664-RS, 2018 WL 1116725 (N.D. Cal. Mar. 1, 2018) ........................... *passim*

*Del-Orden v. Bonobos, Inc.,*
  No. 17 CIV. 2744 (PAE), 2017 WL 6547902 (S.D.N.Y. Dec. 20, 2017) .......................12, 13

*Demar v. Chicago White Sox,*
  No. 05 C 5093, 2006 WL 200640 (N.D. Ill. Jan. 18, 2006) ................................14

*Doe v. Mut. of Omaha Ins. Co.,*
  179 F.3d 557 (7th Cir. 1999) ................................................12

*Dorsey v. CHS, Inc.,*
  No. 15–cv–02735–RBJ, 2017 WL 1356093 (D. Colo. April 13, 2017) ................................14

*Doud v. Yellow Cab of Reno, Inc.,*
  No. 3:13–cv–00664–WGC, 2015 WL 895077 (D. Nev. Mar. 3, 2015) ................................15

*Jones v. Nationwide Life Ins. Co.,*
  696 F.3d 78 (1st Cir. 2012) ................................................14

*N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend,*
  163 F.3d 449 (7th Cir. 1998) ..................................................................2

*Nat'l Ass'n of the Deaf v. Netflix, Inc.,*
  869 F. Supp. 2d 196 (D. Mass. 2012) ...................................................11

*O'Connor v. Uber Techs., Inc.,*
  82 F. Supp. 3d 1133 (N.D. Cal. 2015) ........................................... *passim*

*Packingham v. N.C.,*
  137 S. Ct. 1730 (2017) ...........................................................................13

*PGA Tour, Inc. v. Martin,*
  532 U.S. 661 (2001) .................................................................................8

*Pisciotta v. Old Nat. Bancorp,*
  499 F.3d 629 (7th Cir. 2007) ....................................................................2

*Ramos v. Uber Techs., Inc.,*
  No. SA-14-CA-502-XR, 2015 WL 758087 (W.D. Tex. Feb. 20, 2015) ...............................6, 9

*Special Educ. Srvs. v. Rreef Perform. P'ship-I, L.P.,*
  No. 95 C 6468, 1995 WL 745964 (N.D. Ill. Dec. 11, 1995) ..................14

*Supreme Laundry Serv., L.L.C. v. Hartford Cas. Ins. Co.,*
  521 F.3d 743 (7th Cir. 2008) ....................................................................2

*U.S. v. Crawley,*
  837 F.2d 291 (7th Cir. 1988) ..................................................................12

*Uber B.V. & Others v Mr. Y Aslam & Others,*
  UKEAT/0056/17/DA (10 Nov. 2017) .....................................................10

*Village of Bedford Park v. Expedia, Inc.,*
  876 F. 3d 296 (7th Cir. 2017) ...................................................................5

*Welsh v. Boy Scouts of America,*
  993 F.2d 1267 (7th Cir. 1993) ................................................................13

**Statutes**

42 U.S.C.A. § 2000a .....................................................................................13

42 U.S.C.A. § 12181(10) ................................................................................4

42 U.S.C § 12181(1)(F) ..................................................................................8

42 U.S.C. § 12182.......................................................................................8, 9

42 U.S.C. §§ 12182(a) ................................................................................2, 8, 11, 12

42 U.S.C. §§ 12182(b)(1)(A)(i)–(ii), (b)(1)(D)–(E) ....................................................8

42 U.S.C. § 12182(b)(2) ............................................................................................8

42 U.S.C. §§ 12182(b)(2)(A)(ii), 12182(b)(2)(C)(i) ..................................................3

42 U.S.C. § 12182(b)(2)(C) ......................................................................................8

42 U.S.C. § 12182(b)(2)(C)(i) ..................................................................................9

42 U.S.C. § 12184 ............................................................................................ *passim*

42 U.S.C. § 12184(a) ................................................................................................4

42 U.S.C. § 12184(b)(2) ...........................................................................................7

42 U.S.C. § 12184(b)(3) ...........................................................................................3

42 U.S.C. § 12188(a) ..............................................................................................14

ADA ................................................................................................................ *passim*

Chi. Ordinance § 9-112-570(b)(1), (d), (e) ...............................................................7

Chi. Ordinance § 9-115-100(a) .................................................................................7

Title I of the ADA ..................................................................................................14

Title III of the Americans with Disabilities Act ................................................ *passim*

**Other Authorities**

49 C.F.R. § 37.29(b) ................................................................................................7

49 C.F.R. § 37.105 ...................................................................................................9

Fed. R. Civ. P. 12(c) ................................................................................................2

H.R. Rep. 101-485(II), at 108 (1990) .....................................................................11

**INTRODUCTION**

From a review of Uber's Motion for Judgment on the Pleadings (the "Motion"), one might think this Court can consider materials beyond the pleadings. It cannot. Motions for judgment on the pleadings are decided on the pleadings alone, including the complaint, answer, and written attachments thereto. Uber's self-serving claims that it now provides equivalent service to motorized wheelchair users are gratuitous, and this Court may not consider them in adjudicating the Motion.

Plaintiffs allege that Uber is a travel service, on facts consistent with a now considerable body of law holding that Uber is a travel service, not just a "software and smartphone applications" developer. [115] at 1. As one court put it:

> Uber does not simply sell software; it sells rides. Uber is no more a "technology company" than Yellow Cab is a "technology company" because it uses CB radios to dispatch taxi cabs, John Deere is a "technology company" because it uses computers and robots to manufacture lawn mowers, or Domino Sugar is a "technology company" because it uses modern irrigation techniques to grow its sugar cane. Indeed, very few (if any) firms are *not* technology companies if one focuses solely on *how* they create or distribute their products. If, however, the focus is on the substance of what a firm actually does (*e.g.*, sells cab rides, lawn mowers, or sugar), it is clear that Uber is most certainly a transportation company, albeit a technologically sophisticated one.

*O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1141–42 (N.D. Cal. 2015) (emphases in original).

Title III of the Americans with Disabilities Act (Title III) is replete with commandments to make transportation accessible. Plaintiffs claim Uber's activities violate four provisions of Title III: (1) discrimination by a travel service (¶¶ 60–64); (2) failure to make reasonable modifications (¶ 65); (3) failure to provide equivalent service by an operator of a demand responsive service not subject to section 12184 (¶¶ 67–68); and (4) failure to provide equivalent

service by an operator of a demand responsive service subject to section 12184. ¶¶ 69–70. All of these claims should survive the Motion.

## ARGUMENT[1]

A motion for judgment on the pleadings permits parties to move for judgment after the filing of a complaint and answer. Fed. R. Civ. P. 12(c). For Rule 12(c) purposes, courts "take the facts alleged in the complaint as true, drawing all reasonable inferences in favor of the plaintiff." *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007). Courts decide these motions "based on the pleadings alone," which "include the complaint, the answer, and any written instruments attached as exhibits." *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998). A court cannot "accept as true facts that are outside the four corners of the pleadings or draw from those facts inferences unfavorable to Plaintiff." *Brack v. Dart*, No. 11 C 8192, 2013 WL 2251741, at *3 (N.D. Ill. May 22, 2013). Judgment under Rule 12(c) is appropriate "only when it appears beyond a doubt that the plaintiff cannot prove any facts to support a claim for relief and the moving party demonstrates that there are no material issues of fact to be resolved." *Supreme Laundry Serv., L.L.C. v. Hartford Cas. Ins. Co.*, 521 F.3d 743, 746 (7th Cir. 2008) (quotations omitted).

## I. EQUIVALENT SERVICE IS ONE OF MANY REQUIREMENTS OF TITLE III.

Title III prohibits denying a person with a disability the "full and equal enjoyment" of a business's services. 42 U.S.C. §§ 12182(a); 12184(a). Plaintiffs claim that Uber denies them full and equal enjoyment of Uber's travel service because of their disabilities and that Uber has no intention of making its transportation services accessible to people with disabilities, like Plaintiffs. *See* ¶¶ 58, 77–85. Uber's attempt to reframe the ADA is misguided for two reasons:

---

[1] Plaintiffs incorporate their Statement of Facts, defined terms, and citation customs from their contemporaneously filed Opposition to Defendants' Motion to Dismiss for Lack of Jurisdiction.

*First*, Uber posits that it does not operate a business governed by Title III, focusing on the phrase "equivalent service." But providing equivalent service or other modifications is just one method to avoid engaging in discrimination. It is not a required *element* to sustain those claims. *See* 42 U.S.C. §§ 12182(b)(2)(A)(ii), 12182(b)(2)(C)(i) (listing the failure to provide reasonable modifications or equivalent service when needed to ensure service associability as one form of discrimination). Uber also misapplies section 12184(b)(3) to this case. That section addresses situations where the service provider purchases or leases accessible vehicles, an allegation that has never been raised here. *See* 42 U.S.C. § 12184(b)(3). Putting aside Uber's misunderstandings, however, nothing in the ADA or construing authority supports the claim that Title III covered entities are not generally required to provide transportation to individuals who require wheelchair accessible vehicles.

*Second*, Uber ignores the distinction between providers of goods and services that is recognized in cases construing the ADA. This distinction is important because Uber mistakenly alludes to cases addressing retailers of goods for the proposition that Uber need not alter the content of the services it provides. [115] at 4–5. When applied to *services*, the ADA requires service providers (like Uber) to make their services accessible to people with disabilities.

For instance, in *Ball v. AMC Entm't, Inc.*, hearing impaired plaintiffs alleged that a movie theater violated the ADA by not offering closed captioned movies, thereby denying them equal enjoyment of the theater's services. 246 F. Supp. 2d 17, 19 (D.D.C. 2003). Similar to Uber, *see* [115] at 4–5, the theater argued that ADA "requires public accommodations to make their goods or services generally accessible to all patrons (i.e., deaf patrons must be able to buy tickets and sit in the movie theater), but does not require them to provide *different goods or services* to meet the needs of the disabled patrons." *Id.* at 24 (emphasis added). Further paralleling Uber's argument, the theater claimed the ADA did not require it to show closed captioned movies, just

3

as bookstores need not carry Braille books for blind customers and video stores need not stock captioned videos for deaf customers. *Id.* The court, however, explained that because the theater was a provider of services—*i.e.,* "the *service* of screening first run movies"—it had a duty under the ADA to make its services accessible to people with hearing disabilities. *Id.* at 24–25 (emphasis in original). Likewise, Plaintiffs claim that Uber is a provider of transportation *services*, the sufficiency of which courts have repeatedly accepted at the pleading stage. *See* ¶¶ 5. 22–29, 74. Uber's attempt to invoke the ADA's treatment of providers of goods is incorrect.

## II.   PLAINTIFFS ALLEGE THAT UBER VIOLATES 42 U.S.C. § 12184.

Title III prohibits disability discrimination "in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a). Uber argues that (1) it is not primarily engaged in the business of transporting people, and (2) it cannot be liable for discrimination under this section because it does not own any vehicles. [115] at 11–13. These arguments have been repeatedly rejected by other courts.

### A.   As a travel service, Uber is primarily engaged in the business of transporting people.

The ADA defines specified public transportation services as any "conveyance . . . that provides the general public with general or special service . . . on a regular and continuing basis." 42 U.S.C.A. § 12181(10). Multiple courts have held that Uber's business activities are not excluded from this category.

*Crawford v. Uber Technologies, Inc.*, No. 17-CV-02664-RS, 2018 WL 1116725 (N.D. Cal. Mar. 1, 2018), recently addressed this exact issue in denying Uber's motion for judgment on the pleadings. There, as here, Uber claimed that it was not subject to the anti-discrimination mandate of section 12184 because it was not primarily engaged in the business of transporting

people. *Id.* at *3. Instead, Uber argued, "drivers, rather than Uber, convey passengers in vehicles not owned by Uber," and Uber was merely "a technology company that is engaged in the business of facilitating networking between drivers and riders." *Id.* And, as in the Motion, Uber relied on *Village of Bedford Park v. Expedia, Inc.*, 876 F. 3d 296 (7th Cir. 2017), a municipal taxation case not addressing any aspect of the ADA.

> The court denied Uber's motion, explaining that its "arguments miss the mark" because
>
> whether Uber exerts sufficient control over its drivers such that drivers operate as an extension of Uber when they transport riders is a mixed question of law and fact that cannot be determined on the pleadings . . . . [W]ithout Uber and its competitors, non-professional drivers would find it difficult—if not impossible— to locate a rider and transport her to the destination of her choice for monetary compensation. To say that Uber merely *facilitates* connections between 'both sides of the two-sided ridesharing market' obscures the fact that Uber arguably *created* a market for this type of transportation.

*Crawford*, 2018 WL 1116725, at * 4. (emphasis in original). The court distinguished *Bedford Park*, ruling that "Uber's analogy to expedia.com is a strained one" because unlike Uber's business (which created an entirely novel market for transportation services), "Expedia facilitates a transaction that is not dependent on the service it offers. Hotels have rented rooms to guests long before the creation of expedia.com, and can do so without the website's assistance." *Id.* As the court noted, "[w]hile Expedia does not exercise control over how hotels listed on its website price their rooms or deal with hotel guests, whether the same can be said of Uber's relationship to its drivers is not clear from the pleadings alone." *Id.*

*O'Connor* rejected "Uber's self-definition as a mere 'technology company' [because it] focuses exclusively on the mechanics of its platform (*i.e.*, the use of internet enabled smartphones and software applications) rather than on the substance of what Uber actually *does* (*i.e.*, enable customers to book and receive rides)." 82 F. Supp. 3d at 1141 (emphasis in original). Uber's "unduly narrow frame" ignored "Uber's own documents [that] show[ed] that it

5

characterizes itself as a transportation company, transportation network, or on-demand car service." *Id.*, n.10. Ultimately, the court situated Uber's technology in context as "merely one instrumentality used in the context of its larger business. Uber does not simply sell software; it sells rides." *Id.*; *see Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1078 (N.D. Cal. 2015) (characterizing Lyft's claim that it merely provides a platform connecting drivers and riders as "not a serious one" in light of the control it exerts over the transportation services and its role in creating the market for this service); *Ramos v. Uber Techs., Inc.*, No. SA-14-CA-502-XR, 2015 WL 758087, at *10 (W.D. Tex. Feb. 20, 2015) (sustaining plaintiffs' section 12184 claim because their main assertion—"that Defendants do not merely connect people seeking a ride to those who are willing to give a ride, and that Defendants pay or employ drivers to transport their users, who in turn pay Defendants for the transportation service"—was "plausible").

The Complaint's allegations are no different than those that survived Uber's motion for judgment on the pleadings in *Crawford*. Plaintiffs allege that Uber is a transportation service. ¶¶ 1, 5, 21–23. Plaintiffs also allege that Uber controls all meaningful aspects of the travel service that it offers, including fare-setting, the types of and features of vehicles used, driver requirements, and the quality of the passenger's ride experience. ¶¶ 24–28, 30. Taken as true, these allegations show that Uber is primarily engaged in the business of transporting people under section 12184, and "Uber cannot defeat ADA liability on the grounds that it is not a covered entity." *Crawford*, 2018 WL 1116725, at * 4.

### B. Whether Uber owns or leases vehicles does not impact Plaintiffs' allegations that Uber is liable for discrimination under section 12184.

Uber's other argument is that it deserves the benefit of the exemption the taxi industry receives from the general requirement to provide accessible transportation. [115] at 11–12. Since that exemption only applies to the purchase and lease of new vehicles—activities Uber cannot

perform under Chicago Ordinance[2]—this exemption is unavailable to Uber. Uber's reliance on 49 C.F.R. § 37.29(b) is also unavailing because that regulation addresses only "[p]roviders of taxi service," and Plaintiffs do not allege that Uber is a taxi service.[3] 49 C.F.R. § 37.29(b); *see* ¶ 23 (distinguishing uberTAXI as "simply a referral to Chicago taxi dispatch service to request a licensed taxi.").

*Crawford* rejected this precise argument, observing that "nothing in Section 12184 requires that an entity own or lease its own vehicles in order to qualify as a private entity providing taxi service [or any other covered service] within the meaning of the statute." 2018 WL 1116725, at * 4. Furthermore, the court noted, while "an entity may maintain a fleet of exclusively non-accessible vehicles without violating the ADA . . . [,] the statute's broader anti-discrimination mandate" demands that "[a] covered entity" satisfy its "affirmative obligation to make reasonable accommodations, to provide auxiliary aides and services, and remove barriers to access." *Id.* (citing 42 U.S.C. § 12184(b)(2)). Thus, "Uber could very well be required to provide WAV service through some mechanism in order to comply with the anti-discrimination provisions of Section 12184(b)(2)." *Id.* Uber, then, cannot escape ADA obligations to provide access to its transportation services because it neither owns nor leases the vehicles that deliver its services. *Id.* (citing 42 U.S.C. § 12184(b)(2)).

---

[2] Chi. Ordinance § 9-115-100(a) prohibits Transportation Network Providers, like Uber, from owning, providing financing for obtaining, leasing, or having a beneficial interest in the vehicles operating in the network.

[3] If Uber was a taxi service, however, then it would be forced to comply with the City of Chicago's accessibility requirements for taxi services. These requirements require taxi fleets with more than twenty cabs to make 5% of its fleet wheelchair accessible, maintain records of compliance, and submit to an annual audit of these records by the City of Chicago. Chi. Ordinance § 9-112-570(b)(1), (d), (e).

### III.    PLAINTIFFS ALLEGE THAT UBER VIOLATES 42 U.S.C. § 12182.

Section 12182(a) of the ADA prohibits discrimination against anyone "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Congress intended this section to have a broad sweep "to afford people with disabilities equal access to the wide variety of establishments available to the nondisabled." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 662 (2001). The term "place of public accommodation" is likewise given this liberal construction, *id.*, and its definition includes "travel service." 42 U.S.C § 12181(1)(F). Transportation is also specifically addressed as a covered service. 42 U.S.C. § 12182(b)(2).

Under this section, it is discrimination to:

(1)    deny individuals with disabilities the opportunity to participate in or benefit from the services, privileges, or accommodations that an entity provides;

(2)    deny individuals with disabilities the opportunity to participate or benefit from a service, advantage, or accommodation that is not equal to those offered to other individuals;

(3)    deny equal services, advantages, or accommodations to an individual or entity due to the known disability of an individual with whom the individual or entity is known to have a relationship;

(4)    continue to discriminate against individuals with disabilities; and

(5)    fail to implement reasonable policy modifications that provide access to the services, advantages, or accommodations to individuals with disabilities, unless the entity demonstrates that the modifications would fundamentally alter the nature of those services, advantages, or accommodations.

42 U.S.C. §§ 12182(b)(1)(A)(i)–(ii), (b)(1)(D)–(E). This section also provides examples of specifically covered activity, including a demand responsive transportation system not already covered by section 12184. 42 U.S.C. § 12182(b)(2)(C).

The ADA requires providers of demand response systems not subject to section 12184 to ensure "a level of service to individuals with disabilities, including individuals who use wheelchairs, equivalent to the level of service provided to individuals without disabilities." 42 U.S.C. § 12182(b)(2)(C)(i). This requirement is satisfied when provided "in the most integrated setting appropriate to the needs of the individual," and "is equivalent to the service provided other individuals" in light of response times, fares, geographic area of service, hours and days of service, availability of information, reservations capability, any capacity or service availability constraints, and restrictions priorities based on trip purpose. 49 C.F.R. § 37.105.

Despite this broad statutory scheme, Uber argues that it falls beyond the scope of this section because, as a non-physical place, it is not a place of public accommodation under the ADA. *See* [115] at 6–10. Title III language and Seventh Circuit case law defeat this argument.

A.      **Uber is a travel service and a demand responsive system under section 12182.**

Uber argues that it is not a travel service, but a mere technology company offering a type of marketplace or platform to help "facilitate payments from riders to Drivers." [115] at 1. But as discussed, federal courts have rejected this myopic characterization because it ignores the reality of what Uber does: Uber's app is the tool that allows it to deliver transportation services that it markets to customers, the delivery of which it controls. *See* ¶¶ 21–29; *Crawford*, 2018 WL 1116725, at * 4; *O'Connor*, 82 F. Supp. 3d at 1141; *Cotter*, 60 F. Supp. 3d at 1078; *Ramos*, 2015 WL 758087, at *10.

The conclusions of these American courts are in harmony with those of European courts. When confronted with the question of whether Uber's business operations constituted a travel service or simply the provision of technology services facilitating the connection of riders to drivers, the European Court of Justice determined that "Uber's activity comprises a single supply of transport in a vehicle located and booked by" Uber's app "and that this service is provided,

from an economic standpoint, by Uber or on its behalf." *See* Case C-434/15, *Ass'n Prof'l Elite Taxi v. Uber Sys. Spain SL*, ECLI:EU:C:2017:364, attached as **Exhibit 1**, ¶ 53. In concluding that Uber is "a traditional transport service," the court analyzed the degree of control that Uber exerts over the provision and experience of the service. *Id.* ¶ 42. This degree of control was evident because: (1) Uber created the market for its services; (2) Uber controls drivers with respect to eligibility requirements and how and whether drivers can supply the transportation services; (3) Uber drivers mostly drive for Uber exclusively, and receive compensation for providing large volumes of rides; (4) Uber informs drivers of where they can expect to receive large numbers of rides and preferential fares, and tailors this information to real-time fluctuations in marketplace demand; (5) Uber controls pricing despite the purported driver option to choose receive a lower fare than Uber sets; and (6) the general control Uber exerts over other relevant aspects of the service that shape drivers' ability to provide the service. *Id.* ¶¶ 43–51. These are the same facts alleged in Plaintiffs' Complaint. *¶¶* 21–29 (describing how Uber controls all meaningful aspects of its travel service, such as determining fares, setting driver eligibility criteria, barring drivers who deviate from Uber's service delivery policies, assigning passenger assignments, and controlling the environment inside the vehicles).

A United Kingdom court was even more blunt, stating that it was "entirely satisfied that the drivers are recruited and retained by Uber to operate its transportation business." *See Aslam v Uber BV* [2017] I.R.L.R. 4 (28 Oct. 2016), *appeal dismissed by Uber B.V. & Others v Mr. Y Aslam & Others*: UKEAT/0056/17/DA (10 Nov. 2017), ¶ 93, attached as **Exhibit 2**. As that court noted, any organization

> (a) running an enterprise at the heart of which is the function of carrying people in motor cars from where they are to where they want to be and (b) operating in part through a company discharging the regulated responsibilities of a PHV [private hire vehicle] operator, but (c) requiring drivers and passengers to agree, *as a matter of contract*, that it does not provide transportation services (through [Uber

B.V.] or [Uber London Ltd]), and (d) resorting in its documentation to fictions, twisted language and even brand new terminology, merits, we think, a degree of skepticism.

*Id.* ¶ 87 (emphasis in the original). The court observed that Uber's position was contradicted by the public statement of its own then-CEO, Travis Kalanick, who posted on Uber's website that Uber was "a transportation network spanning 400 cities in 68 countries that delivers food and packages, as well as people, all at the push of a button," the "everyday transportation option for millions of people." *Id.* ¶ 1.

**B.** **Uber's app is a place of public accommodation that Uber owns or operates.**

Even if this Court finds that Plaintiffs failed to properly allege that Uber was a travel service, Uber's activities still qualify it as a "place of public accommodation." 24 U.S.C. § 12182(a). Uber is a service provider, not a retailer. *See, e.g., O'Connor*, 82 F. Supp. 3d at 1141–42. While some courts debate the need for a physical presence for coverage of a retailer, no court has found a transportation provider beyond the reach of Title III because it did not operate in a physical space.

When applied to digital spaces, "[t]he ADA covers the services 'of' a public accommodation, not services 'at' or 'in' a public accommodation." *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 201 (D. Mass. 2012). Accordingly, entities that provide services outside a real, physical space are covered by virtue of the service they provide, not their location. *Id.* Congress never intended for companies to escape ADA coverage by providing an old fashioned travel service under a new business model using smart phone technology. *See id.* "[T]he legislative history of the ADA makes clear that Congress intended the ADA to adapt to changes in technology." *Id.* at 200–01 (citing H.R. Rep. 101-485(II), at 108 (1990)).

Despite Uber's claim that its activities are not covered by Title III unless it operates a physical space, that is not the law of this circuit. Although Uber wanders through multiple

dictionary definitions, the purported impact of cannons of statutory interpretation, and other statutory analysis, it does not fully address case law covering the Seventh Circuit's approach to this issue. The Seventh Circuit has concluded that places of public accommodation include non-physical space, such as websites and other digital spaces.

In *Doe v. Mut. of Omaha Ins. Co.*, 179 F.3d 557 (7th Cir. 1999), the Seventh Circuit held that the term "any place of public accommodation" in 42 U.S.C. § 12182(a) includes digital spaces. The "core meaning" of section 12182(a) is that the "owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, *Web site*, or other facility (*whether in physical space or in electronic space*) that is open to the public cannot exclude disabled persons from entering the facility and once in, from using the facility in the same way that the nondisabled do." *Id.* at 559 (emphases added) (internal citation omitted) (citing *Carparts Distrib. Center, Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 19 (1st Cir. 1994)).

While Uber attempts to deflect the impact of *Doe*'s holding as dicta,[4] other federal courts have accepted *Doe*'s common-sense holding. *See Del-Orden v. Bonobos, Inc.*, No. 17 CIV. 2744 (PAE), 2017 WL 6547902, at **5–10 (S.D.N.Y. Dec. 20, 2017). Observing that "[t]he First and Seventh Circuits . . . have read the ADA to extend to service providers, including websites, with or without a nexus to a physical place," *Del-Orden* held that "[a] commercial website itself qualifies as a place of 'public accommodation' to which Title III of the ADA affords a right of equal access." *Id.* at *7 (citing *Doe*, 179 F.3d at 559). The court acknowledged that many examples of public accommodations listed under section 12181(7) are "brick-and-mortar

---

[4] In order to explain why the express definition of a term under the statutory provision that was at issue in that case should be distinguished from the rest of the opinion, Uber would have to explain why this text should be marginalized as "a remark, an aside, concerning some rule of law or legal proposition that is not necessarily essential to the decision and lacks the authority of adjudication." *U.S. v. Crawley*, 837 F.2d 291, 292 (7th Cir. 1988) (citation omitted).

enterprises," which in 1990 would likely have been understood to refer to" physical spaces. *Id.* "But, given Congress's intention that the ADA be read broadly in light of its remedial aims and that it be construed to keep pace with changing technology," a place of public accommodation "can be fairly read in today's world dominated by e-commerce to encompass a commercial website." *Id.* "Limiting Title III's scope to brick-and-mortar venues would . . . render [Title III] effectively impotent in broad swaths of social and economic life, which would be contrary to the broad remedial purpose of the ADA—an act that has been described as a milestone on the path to a more decent, tolerant, progressive society." *Id.* (quotations omitted); *see Packingham v. N.C.*, 137 S. Ct. 1730, 1735 (2017) ("While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the "vast democratic forums of the Internet" in general . . . .").

Uber's reliance upon *Welsh v. Boy Scouts of America*, 993 F.2d 1267 (7th Cir. 1993), ignores subsequent case law addressing this issue and is otherwise misplaced. [115] at 7. The internet was in its infancy when *Welsh* issued. And *Welsh* holds only that Congress never intended to regulate private homes under Title II. *Id.*; *see* 42 U.S.C.A. § 2000a (unlike in section 12181, not including "services" or other terms not limited to brick and mortar spaces). Thus, *Welsh* addresses concerns not implicated by this lawsuit, and was issued at a time when economic and social life was not lived online. It offers the court no guidance as to whether a business providing transportation services accessed entirely through the internet—an indelible hallmark of contemporary life—is a place of public accommodation that must satisfy the accessibility demands of the ADA.

## IV.  A FORMULAIC REQUEST FOR A MODIFICATION IS NOT REQUIRED

Plaintiffs' request that Uber modify the operation of its travel service to provide equivalent service to motorized wheelchair users was sufficiently articulated when Access

13

Living staff met with Uber staff and asked for such service. ¶ 58. The ADA does not require a more formulaic request. Although the specific form of a request for a modification under Title III of the ADA has not received significant court attention, the similar provision in Title I of the ADA is uniformly interpreted to not require a *pro forma* accommodation request. *Dorsey v. CHS, Inc.*, No. 15–cv–02735–RBJ, 2017 WL 1356093, at *6 (D. Colo. April 13, 2017); *see*, *e.g.*, *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 89 (1st Cir. 2012). No request at all is necessary where the need is obvious. *Dorsey*, 2017 WL 1356093, at *5.

This same standard is applied to Title III cases in the Northern District of Illinois. In one case, a simple request to remain seated at a baseball park until other fans departed was sufficient to state a claim for failure to make reasonable modifications. *Demar v. Chicago White Sox*, No. 05 C 5093, 2006 WL 200640, at *4 (N.D. Ill. Jan. 18, 2006). In another, the right to a reasonable modification was triggered solely by the defendant's action of not renewing a lease instead of exploring reasonable modifications to allow buses to transport school children with disabilities. *Special Educ. Srvs. v. Rreef Perform. P'ship-I, L.P.*, No. 95 C 6468, 1995 WL 745964, at *4 (N.D. Ill. Dec. 11, 1995).

Access Living's specific request for equivalent service for motorized wheelchair users at the August 3, 2016 meeting with high-level Uber staff is far more detailed than the notice that triggered the right to a reasonable modification in either of these cases, and enough to trigger the right. ¶ 58. Because the Individual Plaintiffs are closely associated with Access Living (¶ 11), it is sufficient to support their claims as well.

## V.     ALL PLAINTIFFS HAVE A PRIVATE RIGHT OF ACTION

Access Living and Rahnee Patrick have a private right of action. *See* 42 U.S.C. § 12188(a). Access Living's claim stems from economic harm and frustration of mission, causing the diversion of resources addressed in Section I(B) of Plaintiffs' Response to Defendants'

Motion to Dismiss for Lack of Subject-Matter Jurisdiction. As to Ms. Patrick, Uber misreads the complaint. She is a motorized wheelchair user who can often, *but not always*, transfer into a standard vehicle. ¶ 39. Because there are times when she cannot transfer into a standard vehicle, she has a private right of action under section 12184. But even when Ms. Patrick can transfer to a standard vehicle, her inability to travel with her husband because of Uber's failure to comply with section 12184 is actionable. *See Doud v. Yellow Cab of Reno, Inc.*, No. 3:13–cv–00664–WGC, 2015 WL 895077, at *13 (D. Nev. Mar. 3, 2015) (holding that husband had right of action for cab company's refusal to transport wife's scooter in the trunk of a cab); *A Helping Hand, LLC v. Baltimore Co., MD*, 515 F.3d 356, 365–66 (4th Cir. 2008) (applying associational standing to all three titles of the ADA).

## CONCLUSION

The only facts before this Court show that Uber is a travel service that denies persons with a disabilities the full and equal enjoyment of its services, and that violates the ADA. The Motion should be denied.

Dated: July 5, 2018

/s/ *Steven P. Blonder*
Steven P. Blonder (sblonder@muchshelist.com)
Jonathan L. Loew (jloew@muchshelist.com)
Daniel A. Hantman (dhantman@muchshelist.com)
Much Shelist, P.C.
191 North Wacker Drive
Suite 1800
Chicago, Illinois 60606-2000
Ph. 312-521-2402

Charles R. Petrof (cpetrof@accessliving.org)
Access Living of Metropolitan Chicago
115 W. Chicago Ave.
Chicago, Illinois 60654
Ph. (312) 640-2124
TTY: (312) 640-2169

Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify that on July 5, 2018, a true and correct copy of Plaintiffs' Opposition to Defendants' Motion to Dismiss for Lack of Jurisdiction was electronically filed with the Clerk of the Court using CM/ECF, which will send electronic notification of such filing to parties of record.

/s/ *Steven P. Blonder*