**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ACCESS LIVING OF METROPOLITAN CHICAGO, a not-for-profit corporation; MICHELLE GARCIA; RAHNEE PATRICK; and JUSTIN COOPER, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 1:16-cv-09690 |
| v. | ) ) | Judge Manish S. Shah |
| UBER TECHNOLOGIES, INC., a corporation; and RASIER, LLC, | ) ) ) | Magistrate Judge Maria Valdez |
| Defendants. | ) ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

**Table of Contents**

**Page**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 1

    A.   *Background* ............................................................................................... 1

    B.   *Michelle's Problems With Uber* .............................................................. 4

    C.   *Rahnee's Problems With Uber* ................................................................ 4

    D.   Justin's Problems With Uber ..................................................................... 5

    E.   *Access Living's Problems With Uber* ...................................................... 6

ARGUMENT ....................................................................................................................... 6

    I.   PLAINTIFFS HAVE ALLEGED AN INJURY IN FACT ............................... 8

        A.   The Individual Plaintiffs have alleged an injury in fact. ............................. 8

        B.   Access Living has established an injury in fact. ......................................... 11

    II.   PLAINTIFFS HAVE SUFFICIENTLY ALLEGED THAT UBER CAUSED THEIR INJURY ................................................................................................ 14

    III.  PLAINTIFFS SUFFER FROM A REDRESSABLE INJURY ......................... 15

CONCLUSION .................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abreu v. Harold's Chicken Shack # 60,*
   No. 2:16-CV-243-JD, 2018 WL 1523208 (N.D. Ind. Mar. 28, 2018) ...................................10

*Access Living of Metro. Chicago v. Chicago Transit Auth.,*
   No. 00 C 0770, 2001 WL 492473 (N.D. Ill. May 9, 2001) ......................................................13

*Brooklyn Ctr. for Indep. for the Disabled v. Uber Techs., Inc.,*
   17-cv-6399 (S.D.N.Y. filed July 18, 2017)...............................................................................10

*Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.,*
   867 F.3d 1093 (9th Cir. 2017) ...................................................................................................9

*Crawford v. Uber Techs., Inc., ,*
   No. 17-CV-02664-RS, 2018 WL 1116725 (N.D. Cal. Mar. 1, 2018) ...........................9, 14, 15

*Doran v. 7-Eleven, Inc.,*
   524 F.3d 1034 (9th Cir. 2008) ....................................................................................................8

*Dudley v. Hannaford Bros. Co.,*
   333 F.3d 299 (1st Cir. 2003)........................................................................................................8

*Equal Rights Ctr. v. Uber Techs., Inc.,*
   17-cv-01272 (D.D.C. filed June 28, 2017) ...............................................................................10

*Ezekiel v. Michel,*
   66 F.3d 894 (7th Cir. 1995) .........................................................................................................7

*Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.,*
   28 F.3d 1268 (D.C. Cir. 1994)...................................................................................................14

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
   528 U.S. 167 (2000).....................................................................................................................9

*Gladstone, Realtors v. Vill. of Bellwood,*
   441 U.S. 91 (1979).....................................................................................................................12

*H.O.P.E., Inc. v. Eden Mgmt. LLC,*
   No. 13-CV-7391, 2016 WL 4011225 (N.D. Ill. July 27, 2016).................................................11

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982)...................................................................................................................12

*Indiana Democratic Party v. Rokita*,
   458 F. Supp. 2d 775 (S.D. Ind. 2006) ....................................................................14

*Liberty Res., Inc. v. Se. Pa. Transp. Auth.*,
   155 F. Supp. 2d 242 (E.D. Pa. 2001) ....................................................................12

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555, (1992) ...............................................................................................8

*Mote v. City of Chelsea*,
   No. 16-11546, 2018 WL 262855 (E.D. Mich. Jan. 2, 2018) ................................13

*Nat'l Fed'n of the Blind of Ca. v. Uber Techs., Inc.*,
   103 F. Supp. 3d 1073 (N.D. Cal. 2015) ............................................................8, 13

*Oak Ridge Care Ctr., Inc. v. Racine Co., Wis.*,
   896 F. Supp. 867 (E.D. Wisc. 1995) .....................................................................12

*Pa. Life Ins. Co. v. Randazzo*,
   No. 03 C 3829, 2003 WL 22849025 (N.D. Ill. Dec. 1, 2003) .................................6

*Pestube Sys., Inc. v. HomeTeam Pest Def., LLC*,
   No. CV 05-2832-PHXMHM, 2007 WL 973964 (D. Ariz. Mar. 30, 2007) .............7

*Ramos v. Uber Techs., Inc.*,
   No. SA-14-CA-502-XR, 2015 WL 758087 (W.D. Tex. Feb. 20, 2015) ................10

*Raver v. Capitol Area Transit*,
   887 F. Supp. 96 (M.D. Pa. 1995) ..........................................................................13

*Rennie v. Garrett*,
   896 F.2d 1057 (7th Cir. 1990) .................................................................................7

*Royal Towing, Inc. v. City of Harvey*,
   350 F. Supp. 2d 750 (N.D. Ill. 2004) ......................................................................7

*Scherr v. Marriott Int'l, Inc.*,
   703 F.3d 1069 (7th Cir. 2013) ...........................................................................8, 11

*Scherr v. Marriott Int'l, Inc.*,
   833 F. Supp. 2d 945 (N.D. Ill. 2011) ......................................................................8

*Steger v. Franco*,
   228 F.3d 889 (8th Cir. 2000) ...................................................................................9

ii

**Statutes**

29 U.S.C. § 705(17)(D) .................................................................................................6

29 U.S.C. § 794 ............................................................................................................1

29 U.S.C. § 796f-4 ....................................................................................................1, 2

29 U.S.C. § 796f-4(b)(1)(D) ........................................................................................6

29 U.S.C. § 796f-4(c)(6) ..............................................................................................6

42 U.S.C. § 12102 ..........................................................................................2, 3, 4, 5

42 U.S.C. 12182(b)(1)(E) ...........................................................................................13

42 U.S.C. § 12188(a)(1) ...............................................................................................9

ADA ...................................................................................................................... *passim*

Americans with Disabilities Act [1] ............................................................................1

Title VII of the Rehabilitation Act ...............................................................................6

**Other Authorities**

Rule 12(b)(1) ................................................................................................................6

## INTRODUCTION

Plaintiffs follow established precedent in claiming standing to bring this case. That precedent does not require Plaintiffs to download Uber's app. Title III of the Americans with Disabilities Act (the "ADA") recognizes the common sense notion that plaintiffs who are aware of prohibitive barriers to public accommodations and who have a realistic desire to use those accommodations have suffered an injury in fact. Plaintiffs Michelle Garcia, Rahnee Patrick, and Justin Cooper (the "Individual Plaintiffs") meet that bar, and have standing.

Plaintiff Access Living of Metropolitan Chicago ("Access Living") has also been injured by this discrimination, both because it suffers economic injury when it must use more expensive travel options to transport staff who use motorized wheelchairs, and because it must divert resources to address the decline of transportation accessibility caused by Uber's entry into the Chicago market. Likewise, all Plaintiffs have met the causation and redressability elements of constitutional standing by alleging that Uber's service is not accessible and it refuses to change its operations to make it so.

## STATEMENT OF FACTS

### A.    *Background*

Under 29 U.S.C. § 794 and 29 U.S.C. § 796f-4, Access Living, located in Chicago, is a Center for Independent Living, a nonprofit agency governed and staffed by a majority of people with disabilities. ¶¶ 13, 50.[1] Its mission is to protect and advance the civil rights of people with disabilities and help them live independently. ¶ 9. It offers peer-oriented services, education

---

[1]    Paragraph references are to Plaintiffs' Complaint for Continuing Violations of the Americans with Disabilities Act [1] unless otherwise indicated.

1

programs, systemic and individualized advocacy, and enforcement of civil rights on behalf of people with disabilities. *Id.*

The Individual Plaintiffs are Chicago residents and persons with disabilities under the ADA, 42 U.S.C. § 12102; all work or volunteer for Access Living and use motorized wheelchairs. ¶¶ 14–16, 32, 33, 38, 39, 45. Motorized wheelchairs do not fit in a car trunk; they are used by people with disabilities who cannot operate a manual wheelchair, either for lack of arm strength, lack of upper body strength, or lack of coordination. ¶¶ 7, 8. Motorized wheelchair users require wheelchair accessible vehicles ("WAVs") with ramps and lifts, which are widely used and readily available. ¶ 8.

Uber offers travel services in Chicago.[2] ¶ 5. Uber customers request transportation through Uber's software application ("app"), and Uber arranges rides between passengers and drivers. *Id.* Except for UberTAXI, Uber controls the terms of operation of its travel service. ¶ 24. It uses a formula to decide what passengers pay. *Id.* It imposes temporary price increases for passengers, called "surge pricing," at times that it chooses. *Id.* Uber insures rides for its customers. *Id.* Uber decides the type and maximum age of car used; requires a four-door sedan for UberX travel; inspects vehicles used for UberX travel; and permits only those vehicles passing inspection to be used. ¶ 25. Uber arranges with companies to lease Uber-approved vehicles to UberX drivers. *Id.*

Except for UberTAXI, Uber chooses the type of driver that serves its customers. ¶ 26. Uber has requirements for its drivers' age, experience, licensing, and driving records; conducts criminal background checks on drivers; and operates its own system to decide which drivers will

---

[2] Co-Defendant Rasier, LLC holds the Transportation Network Provider license that the City of Chicago requires for Uber to operate its travel services in Chicago. ¶ 18.

transport Uber passengers. *Id.* Uber assigns the driver for each trip request, and can deactivate drivers who too often cancel the rides that Uber assigns them. ¶ 27. Uber oversees the quality of the Uber ride experience. It maintains community guidelines and deactivates drivers who violate the guidelines; advises its drivers to keep refreshments, phone chargers, and cleaning accessories on hand, and to permit customers to choose the radio station; and uses a rating system to decide if a passenger is allowed to use Uber's travel services. ¶ 28.

Uber is rapidly supplanting the more traditional transportation that Access Living has fought to make accessible to motorized wheelchair users. ¶ 55. In 2012, Access Living campaigned for and won a Chicago Ordinance that required 5% of the taxi fleet to be WAVs, with an increasing percentage reaching 50% in 2030. ¶ 54. Since Uber began operating in Chicago, hundreds of Chicago taxi medallions have been surrendered or are in foreclosure, and far fewer taxis are available. *Id.* By comparison, Uber, which provided 1,935,253 rides in Chicago just in the month of June 2015, only provided 14 rides to motorized wheelchair users from September 2011—when it began Chicago operations—until August 2015. ¶ 56.

Beginning in March 2016, in response to Uber's entry and expansion in Chicago, Access Living and other organizations sought an amendment to an ordinance requiring companies like Uber to provide equivalent service for users of WAVs. ¶ 57. Uber opposed the proposal, and all reference to equivalent service was omitted from the ordinance that passed. *Id.* Thereafter, Access Living and Uber staffers discussed accessibility. ¶ 58. Uber's staff demonstrated their app to show the number of WAVs then operating, but no vehicles were available in Chicago. *Id.* Access Living asked if Uber was going to provide equivalent service to people requiring WAVs. *Id.* Uber responded that it had no intention of doing so, *id.*, leading to this lawsuit.

**B.     *Michelle's Problems With Uber***

Michelle lives in Chicago. ¶ 32. Her motorized wheelchair does not fold and is too heavy to lift into a vehicle without a ramp. *Id.* Michelle is a Community Development Organizer for Access Living. ¶ 33. She uses a wheelchair-accessible taxi to travel to work. *Id.* She wants to use Uber because she has heard that it is fast, cost-effective, safe, reliable, efficient, and convenient. ¶ 34. She has a smartphone, could download the app, and has a credit card. *Id.* But her Access Living co-workers have told her that they cannot use Uber's travel services because Uber lacks WAVs. ¶ 35. They have told her that from 2011 until August 2015, Uber provided just 14 accessible rides in Chicago. *Id.* On September 29, 2016, Michelle's co-workers showed her the app, which identified just one WAV in Chicago. ¶ 36. As a motorized wheelchair user, Michelle has not downloaded the app and thinks it would be futile to do so. *Id.*

**C.     *Rahnee's Problems With Uber***

Rahnee is Access Living's Director of Independent Living Services. ¶ 38. She is a motorized wheelchair user who can often transfer into a standard vehicle. ¶ 39. Her husband, Mike Ervin, is a motorized wheelchair user who needs a WAV for transportation. *Id.* Rahnee and Mike live together in Chicago. *Id.*

Mike is Access Project Coordinator at Chicago's Victory Gardens Theater. ¶ 40. During the 2015–16 theater season, Uber participated in the Victory Gardens Access Project, an outreach program to involve people with disabilities in the theater. *Id.* Uber agreed to transport disabled persons to Victory Gardens, where they could attend plays presented in ways that are accessible to people with disabilities. ¶ 41. Mike oversees such events. *Id.* Mike downloaded the app, intending to use Uber's travel promotion. ¶ 42. But Mike did not finish his application because colleagues had told him that Uber does not accommodate motorized wheelchair users.

4

*Id.* Mike thus determined that he could not rely on Uber to get him to Victory Gardens. *Id.* On October 11, 2016, Mike viewed a screen shot of the app taken by a colleague showing that no WAVs were available, confirming his belief that, as a motorized wheelchair user, he lacks access to Uber's travel services. ¶ 43. Rahnee wants to use Uber to travel with Mike. ¶ 44. She owns a smartphone, can download the app, and has a credit card. *Id.* She has not downloaded the app because Uber does not provide equivalent services to Mike. *Id.*

**D.     *Justin's Problems With Uber***

Justin is an Access Living volunteer board member[3] living in Chicago. ¶ 45. In August 2016, Justin and an ambulatory friend ate at a Chicago restaurant. ¶ 46. After their meal, they wanted to go to Harlem Irving Plaza. *Id.* Because Justin heard that Uber does not offer equivalent service to motorized wheelchair users, he determined he could not use Uber to get to Harlem Irving Plaza. *Id.* Instead, they crossed the street to T.J. Maxx, and then went home. *Id.*

Justin concluded that Uber was unavailable to persons requiring WAVs because he knew of the unsuccessful effort to pass a Chicago ordinance requiring Uber to provide a minimum number of WAVs with equivalent response times and fares. ¶ 47. Access Living staff who advocated for that ordinance also told Justin that Uber was lobbying against a requirement that it provide equivalent service to persons who need WAVs. *Id.* On October 10, 2016, Justin viewed the app from an Access Living staffer's phone. ¶ 48. The app showed that no WAVs were available through Uber. *Id.* Justin wants to use Uber. ¶ 49. He has a smartphone to download the app, and a credit card. *Id.* He has not done so because he believes that Uber does not provide equivalent access to motorized wheelchair users. *Id.*

---

[3] Justin is a member of a volunteer organization that supports Access Living's work but does not have governing authority. Its official name is the Young Professionals Counsel.

### E.       *Access Living's Problems With Uber*

As a Center for Independent Living, a majority of Access Living's staff and decision makers are people with disabilities, as required by 29 U.S.C. § 796f-4(c)(6). Fourteen percent of staff and 20% of the board use motorized wheelchairs. ¶ 51. Title VII of the Rehabilitation Act and 29 U.S.C. § 705(17)(D) requires that Access Living's core services include "individual and systems advocacy," meaning that Access Living must promote "equal access for individuals with significant disabilities, within their communities to society and to all services, programs, activities, resources, and facilities, whether public or private and regardless of the funding source." 29 U.S.C. § 796f-4(b)(1)(D). ¶ 52. As a result, Access Living has a long history of advocating for accessible travel services, from bus lifts to accessible taxis. ¶¶ 53–54.

Uber's failure to provide WAVs harms Access Living directly in two ways. *First*, Access Living incurs greater costs than it otherwise would to transport employees and board members who use motorized wheelchairs, all of whom lack equivalent access to Uber's transportation services. ¶¶ 59, 77–78. *Second*, Access Living must divert resources that would otherwise be used to fulfil its statutory mandate of promoting equal access for individuals with disabilities in ways that would permit them to live independently and be fully integrated into their communities, a core purpose of the ADA. ¶ 59. Access Living must divert finite resources to counteract Uber's failure to provide equivalent service to motorized wheelchair users and the resultant damage Uber's causes to the accessibility of regional transportation. ¶¶ 54, 59.

## ARGUMENT

"A Rule 12(b)(1) motion requires a court to dismiss any action for which it lacks subject matter jurisdiction." *Pa. Life Ins. Co. v. Randazzo*, No. 03 C 3829, 2003 WL 22849025, at *1 (N.D. Ill. Dec. 1, 2003). "If the motion contends that the allegations of jurisdiction are facially

insufficient to show jurisdiction, then the 12(b)(1) standard of review mirrors the standard applied for 12(b)(6) motions," *Royal Towing, Inc. v. City of Harvey*, 350 F. Supp. 2d 750, 752 (N.D. Ill. 2004), which requires the court to "accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). However, "a federal court determining whether it has jurisdiction may look beyond the face of the plaintiff's complaint to resolve factual disputes" to the extent they are raised. *Rennie v. Garrett*, 896 F.2d 1057, 1057–58 (7th Cir. 1990).

Uber's motion asserts unsupported claims that exceed the allegations of the complaint. Plaintiffs, despite repeated motions to compel discovery, cannot respond to those claims because they still lack discovery addressing basic issues that go to standing. Uber's discovery responses neither allow Plaintiffs to understand the type of business Uber operates (*i.e.*, the degree to which Uber drivers are independent transportation providers operating outside of Uber's control in an open marketplace or are simply independent contractors working for Uber in furtherance of Uber's corporate activities) nor determine whether its WAV service is equivalent to the service provided to people without disabilities. Yet Uber's standing arguments implicate these exact issues, on which discovery has not been completed. Plaintiffs pled that Uber provides a travel service by controlling the terms of the transportation provided through its app, not that Uber is only an app developer. Without a complete discovery production, which Plaintiffs still do not have, standing must be judged based on the allegations in Plaintiffs' Complaint. *See Pestube Sys., Inc. v. HomeTeam Pest Def., LLC*, No. CV 05-2832-PHXMHM, 2007 WL 973964, at *3 (D. Ariz. Mar. 30, 2007) (holding that plaintiff's exclusive reliance on the complaint's factual allegations was the proper response to motion to dismiss for lack of standing where the motion

was unsupported by affidavit or evidence, and discovery that might impact standing was incomplete).

Standing requires: (1) an injury in fact that is concrete, particularized, actual, and imminent, not conjectural or hypothetical; (2) that the injury is fairly traceable to the defendant; and (3) that the injury will likely be redressed by a favorable decision. *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). When private enforcement is the primary method for ensuring compliance with civil rights laws like the ADA, courts must "take a broad view of constitutional standing." *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 (9th Cir. 2008); *see Scherr v. Marriott Int'l, Inc.*, 833 F. Supp. 2d 945, 954 (N.D. Ill. 2011) (quoting *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003)) ("[a]t the motion to dismiss stage . . . [,] 'courts should resolve doubts about such [standing] questions in favor of disabled individuals'").

## I. PLAINTIFFS HAVE ALLEGED AN INJURY IN FACT.

### A. The Individual Plaintiffs have alleged an injury in fact.

The Individual Plaintiffs allege they have been injured because Uber denies them equivalent use of Uber's travel service because of their disabilities. Uber's denial was complete when its own staff demonstrated to Access Living that Uber had no WAV vehicles available on their systems and asserted that they did not intend to provide equivalent service. ¶ 58. Further action to download Uber's app is unnecessary.

Uber's suggested standard, requiring an intent to return to a particular place of business, is unsuitable to this case about a travel service. The proper standard requires showing knowledge of a barrier and intent to use the service. *Nat'l Fed'n of the Blind of Ca. v. Uber Techs., Inc.*, 103 F. Supp. 3d 1073, 1082 (N.D. Cal. 2015). Personal encounters with a barrier are not required to

establish an ADA plaintiff's knowledge of an imminent injury: second-hand knowledge of the barrier is sufficient because "[i]t is the plaintiff's actual knowledge of a barrier, rather than the source of that knowledge, that is determinative." *Civil Rights Educ. & Enf't Ctr. v. Hosp. Props. Tr.*, 867 F.3d 1093, 1099 (9th Cir. 2017). Therefore, neither the ADA nor Article III require a disabled plaintiff to engage in the futile gesture of incurring an expected injury if the plaintiff has actual knowledge that the defendant does not intend to comply with the ADA. *See* 42 U.S.C. § 12188(a)(1) (plaintiff need not engage in "futile gesture" to experience defendant's non-compliance if plaintiff knows that defendant intends not to comply); *Steger v. Franco*, 228 F.3d 889, 892 (8th Cir. 2000) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (holding in the context of an Article III injury in fact analysis that a plaintiff "need not engage in the 'futile gesture' of visiting a building containing known barriers that the owner has no intention of remedying," but "must at least prove knowledge of the barriers and that they would visit the building in the imminent future but for those barriers").

Uber's assertion here—that the Individual Plaintiffs lack actual knowledge of Uber's non-compliance because they failed to download Uber's app—and thus lack an injury in fact— has repeatedly been discarded by other federal courts. Most recently, in *Crawford v. Uber Techs., Inc.*, Uber lost the exact same argument it repeats here: that wheelchair-using plaintiffs lacked Article III standing because "plaintiffs' alleged injury—being denied access to Uber's service—is insufficiently concrete because they have never downloaded the Uber app." No. 17-CV-02664-RS, 2018 WL 1116725, at *1 (N.D. Cal. Mar. 1, 2018). The court found Uber's position "unpersuasive . . . because plaintiffs suing under Title III are not required to engage in a 'futile gesture' in order to show actual injury under the ADA." *Id.* The court found Article III standing based on the plaintiffs' "actual knowledge that the Uber app . . . does not have a

mechanism for summoning a WAV vehicle, which precludes them from using the transportation services the app facilitates. Thus, they are deterred from downloading the Uber app." *Id.* This deterrence coupled with their desire to use Uber "demonstrate[d] a concrete and imminent injury under the ADA" that satisfied the Article III injury in fact requirement. *Id.*; *see also National Federation*, 103 F. Supp. 3d at 1081 (to establish standing, plaintiff "does not need to use Uber's services and risk being turned away when he has knowledge that disabled individuals with service animals have been turned away, and he believes there is a likelihood of continued discrimination"); *Ramos v. Uber Techs., Inc.*, No. SA-14-CA-502-XR, 2015 WL 758087, at **6–9 (W.D. Tex. Feb. 20, 2015) (finding satisfactory injury for wheelchair-using plaintiffs when they alleged actual knowledge of Uber's non-compliance with the ADA and that they were deterred by this knowledge).[4]

The cases cited by Uber address the likelihood of returning to a particular establishment and are either inapposite or support the Individual Plaintiffs' standing. For example, *Abreu v. Harold's Chicken Shack # 60*, No. 2:16-CV-243-JD, 2018 WL 1523208 (N.D. Ind. Mar. 28, 2018), addressed a situation—nonexistent here—where an ADA tester from Florida visited a fast food restaurant in Indiana for the purpose of probing compliance. *Id.* at *1. In finding an absence of an imminent injury, the court noted that the plaintiff had not stated a reason to venture to a different region of the country to patronize that particular fast food restaurant again. *Id.* at *2. Those facts do not apply to the Individual Plaintiffs, who desire access to one of the most popular transportation services operating in the very city in which they live. *See* ¶¶ 34, 44, 49.

---

[4] Nearly identical motions challenging subject matter jurisdiction in cases involving Uber's failure to provide equivalent service to wheelchair-using passengers are currently pending in other federal courts. *See Equal Rights Ctr. v. Uber Techs., Inc.*, 17-cv-01272 (D.D.C. filed June 28, 2017); *Brooklyn Ctr. for Indep. for the Disabled v. Uber Techs., Inc.*, 17-cv-6399 (S.D.N.Y. filed July 18, 2017).

In contrast, *Scherr* supports the Individual Plaintiffs' standing. There, the Seventh Circuit held that while the plaintiff lacked an injury in fact as to hotels in locations where she could not show an intent to visit, she established a sufficient injury as to the hotel near her family, whom she visited often. 703 F. 3d at 1074–75. Similarly, the Individual Plaintiffs have actual knowledge of Uber's violations, an imminent intent to use Uber (the dominant transportation service provider where they live), and Michelle Garcia must pay Uber additional fees by booking a traditional taxi for the same service provided to ambulatory users. *See* ¶¶ 29–49.

### B.    Access Living has established an injury in fact.

Access Living establishes injury-in-fact based on the injury Access Living suffered itself. Despite the suggestion in Defendant's brief, injury to an organization can be in a form other than frustration of mission and diversion of resources. Access Living suffers direct economic loss because those staff who use motorized wheelchairs cannot use Uber's low cost travel service to conduct their work activities. Access Living is also injured in that its long history of advocating for and increasing accessible transportation in Chicago is threatened by Uber's entry into the Chicago transportation market. This requires Access Living to divert resources to address the erosion of past victories, separately satisfying the standard for injury-in-fact.

Under the ADA, an organization can prove injury-in-fact in one of three separate ways: organizational standing, representational standing, and—under certain specific language in the ADA—associational standing. Organizational standing is appropriate when the organization itself is injured by defendant's conduct. *H.O.P.E., Inc. v. Eden Mgmt. LLC*, No. 13-CV-7391, 2016 WL 4011225, at *3 (N.D. Ill. July 27, 2016). Access Living has pled only organizational standing based on its own injury.

Economic injury is sufficient to satisfy the injury-in-fact element for standing. *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110 (1979) (reduction of tax base through reduction of property values sufficient injury to a municipality to establish standing). Looking specifically at standing to assert ADA claims, economic injury caused by the prevention of the sale of property has satisfied the injury-in-fact standard, *Oak Ridge Care Ctr., Inc. v. Racine Co., Wis.*, 896 F. Supp. 867, 873 (E.D. Wisc. 1995), as well as organizational expenses for transporting staff, volunteers and clients when discrimination impacts their travel options, *Liberty Res., Inc. v. Se. Pa. Transp. Auth.*, 155 F. Supp. 2d 242, 251 (E.D. Pa. 2001). Since Access Living has pled its economic injury in terms of increased costs of transporting the 14% of staff and 20% of board members who use motorized wheelchairs (¶¶ 51, 59), Access Living has established injury-in-fact in its economic losses sufficient to establish standing.

In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the Supreme Court approved a narrower category of economic injury sufficient to establish injury-in-fact. Instead of an economic loss, the organizational plaintiff alleged injury from frustration of its mission coupled with diversion of resources addressing the conduct frustrating its mission. *Id.* at 379. Access Living also alleges such an injury. Access Living not only pled a mission to advocate "for travel services that are fully accessible to persons with disabilities," (¶ 53) it also demonstrates its successful history of advancing this mission from the installation of lifts on busses in 1984 to requiring accessible taxis in 2012. ¶¶ 53–54. The decline in the taxi industry with its accessibility requirements caused by the rise of Uber's essentially inaccessible service frustrates Access Living's efforts to increase accessible transportation options in the area. ¶¶ 55–56.

Faced with this frustration of a long term mission, Access Living diverted its resources to campaign for a local ordinance to require Uber to meet the taxi industry's level of accessibility

and to meet with Uber staff to advocate for greater accessibility. ¶¶ 57–59. These allegations prove injury-in-fact under *Havens*' frustration of mission and diversion of resources test. *See Raver v. Capitol Area Transit*, 887 F. Supp. 96, 98 (M.D. Pa. 1995) (center for independent living had standing to sue fixed-route transportation system for ADA violations in the community); *Mote v. City of Chelsea*, No. 16-11546, 2018 WL 262855, at **18–19 (E.D. Mich. Jan. 2, 2018) (center for independent living had standing due to pre-litigation advocacy addressing inaccessible sidewalks).

Access Living was previously found to have organizational standing in facts similar to this case where it challenged ADA violations of the Chicago Transit Authority's bus and rail service. *See Access Living of Metro. Chicago v. Chicago Transit Auth.*, No. 00 C 0770, 2001 WL 492473, *4 (N.D. Ill. May 9, 2001). The court concluded that Access Living had standing because it had expended time fighting discrimination that

> would otherwise be spent counseling, providing independent living skills, training and referral services, advocating for the rights of the disabled, and otherwise fulfilling its legislatively mandated care services requirements to the disabled. Access Living employees have devoted time to documenting and responding to complaints of its members regarding their problems with the CTA's failure to provide appropriate access and services to persons with disabilities. In addition, members of Access Living's Board have been late or unable to attend meetings because of problems relating to their disabilities riding the CTA, thereby costing lost time and opportunities to conduct the business of the agency.

*Id.* Standing considerations in this case are no different. Defendant's assertion in Section IV of its brief that Access Living lacks representational standing[5] misstates the Complaint. Access Living does not plead representational standing, although it reserves that right.

---

[5] While Uber describes this form of standing as associational, this brief uses the other accepted term to avoid confusion with 42 U.S.C. 12182(b)(1)(E). Representational standing is based on a three-part test focused on the rights of an organization's members, not at the broader category of with whom that organization associates. *See National Federation*, 103 F. Supp. 3d at 1078–79.

## II.     PLAINTIFFS HAVE SUFFICIENTLY ALLEGED THAT UBER CAUSED THEIR INJURY.

Uber suggests that because Access Living reimbursed staff for work related travel, any harm flowing as a result of discrimination to its staff or managers is self-inflicted. [112 at 10.] Essentially, Uber argues that Access Living should deny itself access to a widely used human resources tool to avoid interacting with Uber's discriminatory travel service. This position cannot be right. If it were, then no center for independent living or any other entity, including business entities, would ever have standing because their operational choices would constitute a discretionary choice rendering any claimed harm self-inflicted, and thus destroy Article III standing. Uber has cited no authority for this circuitous principle, and the cases upon which it rests are inapposite. *See Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 816–17 (S.D. Ind. 2006) (finding a self-inflicted injury that destroyed article III standing when the organization based injury on "optional programming" not central to the organization's core mission); *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (finding a self-inflicted injury resulting from discretionary budgeting choices relating to the decision to investigate possible discrimination).

For the Individual Plaintiffs, Uber claims that the independence of its drivers breaks the causation chain. This position does not undercut the Individual Plaintiffs' standing because (1) that issue forms the core of this lawsuit, and (2) other courts have already held that the existence of a dispute regarding this core issue—the independence of Uber's drivers—is a question of fact that cannot negate standing at the preliminary stage of a lawsuit seeking equivalent service under the ADA. *See, e.g., Crawford*, 2018 WL 1116725, at *1 (rejecting Uber's argument against standing that the scope of the transportation services at issue "is entirely dependent on drivers'

choices" because plaintiffs alleged that Uber controlled those services, which was one of the ultimate questions of fact of that lawsuit). Accordingly, Plaintiffs have established standing.

## III. PLAINTIFFS SUFFER FROM A REDRESSABLE INJURY.

Like Uber's causation argument, Uber's redressability argument has been rejected by other courts. Essentially, Uber argues that "plaintiffs fail to establish redressability because the prospective benefits of their requested remedy turn on the independent decisions of third party drivers." *Crawford*, 2018 WL 1116725, at *3.

Plaintiffs seek an injunction requiring Uber to provide satisfactory equivalent service under the ADA to individuals who use motorized wheelchairs. ¶ 85(B). When confronted with an similar request for relief, *Crawford* found that the wheelchair-using plaintiffs asserted a redressable injury because no reason exists to believe

> that Uber could not institute possession of a WAV as a prerequisite for drivers who wish to provide rides through the app. Such a modification to Uber's policies would arguably redress plaintiffs' alleged injury. Nor is it possible to determine conclusively that there are *no other* reasonable modification options available that would enable Uber to meet the requirements of the ADA . . . . Uber points to no authority indicating that plaintiffs are required to allege the precise means of redress at the pleading stage. Here, plaintiffs plausibly state a claim for relief that is not beyond the power of the Court to address.

*Id.* (emphasis in original). Additionally, as recognized in the first page of Uber's brief, Uber could simply change the terms that it applies to WAV drivers until such drivers are properly incentivized to enter Uber's service in sufficient numbers. Accordingly, Plaintiffs' injuries are redressable, and their claim satisfies Article III standing requirements.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court deny Uber's motion to dismiss.

Dated: July 5, 2018

/s/ *Steven P. Blonder*
Steven P. Blonder (sblonder@muchshelist.com)
Jonathan L. Loew (jloew@muchshelist.com)
Daniel A. Hantman (dhantman@muchshelist.com)
Much Shelist, P.C.
191 North Wacker Drive
Suite 1800
Chicago, Illinois 60606-2000
Ph. 312-521-2402

Charles R. Petrof (cpetrof@accessliving.org)
Access Living of Metropolitan Chicago
115 W. Chicago Ave.
Chicago, Illinois 60654
Ph. (312) 640-2124
TTY: (312) 640-2169

Counsel for Plaintiffs

16

**CERTIFICATE OF SERVICE**

I, Steven P. Blonder, an attorney, hereby certify that on July 5, 2018, a true and correct copy of Plaintiffs' Opposition to Defendants' Motion to Dismiss for Lack of Jurisdiction was electronically filed with the Clerk of the Court using CM/ECF, which will send electronic notification of such filing to parties of record.


/s/ *Steven P. Blonder*