UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ACCESS LIVING OF METROPOLITAN CHICAGO, et al., | |
| Plaintiffs, | No. 16 CV 9690 |
| v. | Judge Manish S. Shah |
| UBER TECHNOLOGIES, INC. and RASIER, LLC, | |
| Defendants. | |

MEMORANDUM OPINION AND ORDER

Plaintiffs are people with disabilities who use motorized wheelchairs and Access Living of Metropolitan Chicago, a non-profit organization that advocates for people with disabilities. They claim Uber is violating the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*., by not providing people who use motorized wheelchairs with access to its services that is equal to the access it provides to people who do not. Uber moves to dismiss the complaint based on a lack of standing or, in the alternative, for judgment on the pleadings.

I.    **Legal Standards**

Uber moves to dismiss the complaint under Rule 12(b)(1) for a lack of subject-matter jurisdiction.[1] Plaintiffs bear the burden of establishing the court's jurisdiction.

---

[1] Technically, the motion is untimely, *see* Fed. R. Civ. P. 12(b) (requiring Rule 12(b) motions to be made before a responsive pleading), and better understood as a "suggestion" that the court lacks jurisdiction. *See S.J. v. Hamilton Cty., Ohio*, 374 F.3d 416, 418 n.1 (6th Cir. 2004) ("The district court properly construed this late-filed motion as a 'suggestion' that it lacked subject-matter jurisdiction."); Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

*Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 589 (7th Cir. 2014). To survive Uber's facial challenge to jurisdiction, the complaint must plausibly allege standing. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173–74 (7th Cir. 2015). Uber's motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a Rule 12(b)(6) motion to dismiss, meaning that it must be granted "only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012) (citation omitted). In resolving both motions, I consider only the pleadings, documents incorporated by reference in the pleadings, and matters subject to judicial notice, accepting the well-pleaded facts as true and drawing all reasonable inferences in plaintiffs' favor. *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 640 (7th Cir. 2017); *Silha*, 807 F.3d at 173.[2]

## II. Facts

Uber operates a rideshare app that allows users to request transportation and then connects them with a vehicle and a driver. [1] ¶ 5.[3] Uber's services are available to people who download the app on their smartphones and open an account with a credit card. [1] ¶ 21. Uber users can request specific kinds of rides, including some that vary in the type of vehicle that arrives. [1] ¶¶ 21–23. UberWAV is one of these

---

[2] Uber's motion presents a facial challenge to jurisdiction, not a factual one, [112] at 10 ("Plaintiffs fail to plausibly allege standing."), confining my review to the pleadings. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009) ("In the context of facial challenges . . . the court does not look beyond the allegations in the complaint.").

[3] Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header at the top of filings. Facts are taken from the complaint, [1].

special requests, which allows users to request a wheelchair-accessible vehicle. [1] ¶ 21.

Uber does not own the vehicles used for its rides, but it controls all aspects of the rides. [1] ¶¶ 5, 24.[4] Uber sets requirements for the type and age of vehicles, conducts mandatory vehicle inspections, and helps drivers arrange leases for Uber-approved vehicles. [1] ¶¶ 25, 28. Uber regulates its drivers by conducting background checks and setting requirements for drivers' age, experience, licensing, and driving records. [1] ¶ 26. Uber instructs the drivers on the expected quality of the rides—issuing community guidelines, making recommendations about the amenities to stock in the vehicles and the radio station choice, and imposing cleanliness requirements. [1] ¶ 28. Uber can deactivate drivers who break its rules. [1] ¶¶ 27–28. Uber drivers and passengers do not negotiate the ride's fare; instead, Uber sets the cost of the trip using a certain formula. [1] ¶ 24.

Access Living of Metropolitan Chicago is a non-profit organization that advocates for people with disabilities, seeking to advance their civil rights and help them live more independently. [1] ¶ 9. It offers independent living services, public education programs, and individualized and systemic advocacy, and it enforces civil rights on behalf of those with disabilities. [1] ¶ 9. Fourteen percent of Access Living's employees and 20 percent of its board members either use a motorized wheelchair or cannot transfer to a standard vehicle from their manual wheelchairs. [1] ¶ 10.

---

[4] UberTAXI refers users to Chicago's taxi dispatch service to request a licensed taxi, and it is different from all of Uber's other services. [1] ¶ 23. For that reason, the references to Uber's services in this opinion do not include UberTAXI.

Motorized wheelchairs are heavy and cannot fit into the trunk of a car, so they require ramps and lifts to be put inside vehicles. [1] ¶ 8. Uber is "virtually unavailable" to people who use motorized wheelchairs—it provided them just 14 rides from September 2011 to August 2015. [1] ¶¶ 29, 56. The lack of accessible Uber rides requires Access Living to incur increased costs to transport its staff and board members who require accessible rides. [1] ¶ 59. In August 2016, Access Living took this issue to Uber. [1] ¶ 58. Access Living showed Uber the app, which at the time had no available accessible vehicles, and asked it to provide motorized-wheelchair users with services equivalent to those it offers others. [1] ¶ 58. Uber responded that it had no intention of providing equivalent response times. [1] ¶ 58.

Michelle Garcia, Justin Cooper, and Rahnee Patrick are all Chicago residents who work or volunteer at Access Living, and they all have disabilities that require use of a motorized wheelchair. [1] ¶¶ 14–16, 32–33, 38–39, 45. Patrick can usually transfer from her wheelchair to a standard vehicle, but her husband, who also uses a motorized wheelchair, cannot. [1] ¶ 39. Garcia, Cooper, and Patrick want to use Uber (Patrick with her husband), and they have the smartphones and credit cards they need to do it. [1] ¶¶ 34, 44, 49. But none of them have downloaded the Uber app, because they believe that Uber does not provide equivalent services to people who use motorized wheelchairs. [1] ¶¶ 37, 44, 49. They each found out about the lack of accessible services in different ways.

Garcia heard from other motorized-wheelchair users at Access Living that they cannot use Uber because it does not have accessible vehicles, and Access Living

4

colleagues showed Garcia the Uber app in September 2016, which at the time had just one accessible vehicle available in Chicago. [1] ¶¶ 35–36. Cooper once wanted to take an Uber ride to the mall, but he believed he could not because he had heard that Uber does not offer equivalent services to motorized-wheelchair users. [1] ¶ 46. He believed that because he knew about an unsuccessful effort to pass an ordinance requiring equivalent service and that Uber was lobbying to be free of such a requirement. [1] ¶ 47. In October 2016, Cooper saw the Uber app on someone else's phone, and the app showed no available accessible vehicles. [1] ¶ 48. Patrick's husband downloaded Uber to take advantage of a promotion Uber offered for a theater event, but he did not complete registration because his colleagues from the theater told him that Uber does not accommodate motorized-wheelchair users. [1] ¶ 40–42. In October 2016, Patrick's husband saw a screenshot of the Uber app, showing that there were no available accessible vehicles. [1] ¶ 43.

Plaintiffs allege violations of the ADA and request declaratory and injunctive relief against Uber and its subsidiary.

## III. Standing

Uber argues that none of the plaintiffs have standing to bring this suit. The constitution limits federal-court jurisdiction to controversies brought by plaintiffs who "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016).

### A.    Injury-in-Fact

#### 1.    *Individual Plaintiffs*

Plaintiffs must allege an injury in fact that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). Because they seek prospective injunctive relief, plaintiffs must allege a "real and immediate" threat of future ADA violations. *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (citation omitted). So on top of a past injury, a plaintiff must also allege that the discrimination will continue and injure her in the future. *Scherr*, 703 F.3d at 1074. This threat of future injury can be shown by an intent to return to or use the public accommodation, *id.*, but it can also be shown by establishing that the plaintiff is reasonably deterred from the accommodation because of the discrimination. *See Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 949 (9th Cir. 2011) (en banc); *Scherr v. Marriot Int'l, Inc.*, 833 F.Supp.2d 945, 951 (N.D. Ill. 2011), *aff'd*, 703 F.3d 1069 (7th Cir. 2013). That is because if a plaintiff alleges that she is presently deterred and that the discrimination will continue, the threat of future discrimination is both real and immediate.

The individual plaintiffs want to use the Uber app but are deterred from doing so because Uber does not provide them with equal access to its services, in violation of the ADA. *See* [1] ¶¶ 11, 84. Deterrence can be an injury in fact. *See Pickern v.*

*Holiday Quality Foods Inc.*, 293 F.3d 1133, 1137–38 (9th Cir. 2002) ("We hold that in stating that he is currently deterred from attempting to gain access to the Paradise store, Doran has stated sufficient facts to show concrete, particularized injury."). *See also Laidlaw*, 528 U.S. at 181–85 (finding allegations that defendant's pollution deterred plaintiffs from enjoying a nearby river sufficient to establish an injury-in-fact).

For a deterrence injury to be sufficiently concrete and non-speculative, the deterrence must be reasonable. *See Laidlaw*, 528 U.S. at 184–85.[5] It is reasonable that Garcia's and Cooper's observations of the lack of accessible vehicles available on the Uber app, [1] ¶¶ 36, 48, combined with the fact that they heard about the accessibility problem from others, [1] ¶¶ 35, 46–47, cause them to refrain from using Uber's services. But Patrick does not allege that she ever knew about Uber's alleged ADA violations or the lack of accessible vehicles—she only alleges what her husband knew—and it is not reasonable for someone to be deterred by conduct she never knew about. Patrick's claims are dismissed without prejudice for lack of standing. *See Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000) (ADA plaintiffs "must at least prove knowledge of the barriers").

Garcia and Cooper did not have to download the app and request an Uber ride to be injured. They saw the app, learned of the lack of wheelchair-accessible rides,

---

[5] A plaintiff pleading a deterrence injury must also establish that she would have been subject to the defendant's unlawful conduct. *Laidlaw*, 528 U.S. at 184. *See also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 419 (2013). Plaintiffs have plausibly alleged that if they were not deterred and actually went forward with requesting an Uber ride, they would be subjected to discrimination because of an inadequate supply of wheelchair-accessible rides on the app.

and want to use the app in the future but reasonably believe they cannot. That is sufficient.[6] Their allegations that they are currently deterred from using Uber and that Uber has no intention of making modifications establish the "real and immediate" threat of future violations required to seek prospective injunctive relief. *See also Chapman*, 631 F.3d at 950 ("Just as a disabled individual who intends to return to a noncompliant facility suffers an imminent injury from the facility's 'existing or imminently threatened noncompliance with the ADA,' a plaintiff who is deterred from patronizing a store suffers the ongoing 'actual injury' of lack of access to the store." (citation omitted)). And though "'some day' intentions" do not establish an actual or immediate injury, *Lujan*, 504 U.S. at 564, plaintiffs allege their desire to use the Uber app in the present tense, meaning now, not "some day." *See Laidlaw*, 528 U.S. at 184.[7] Uber points to *Scherr*, where the court found the plaintiff did not sufficiently allege that she intended to visit certain hotels in the future, 703 F.3d at 1075, but plaintiffs' desires to use Uber's services, which are currently available and alleged to be widely used in the city in which they live, are not speculative. And Uber said "it had no intention of providing equivalent response times," [1] ¶ 58, which is

---

[6] Perhaps they intentionally avoided the arbitration agreement that would have accompanied their download and acceptance of the terms of service so that they could seek redress in the court system, but that does not mean they were not injured.

[7] Uber argues that the individual plaintiffs "do not even assert that they would use the Uber App but for the allegedly deficient numbers of Drivers" with accessible vehicles. [112] at 12. The individual plaintiffs each allege that they "want" to use Uber and that they have not downloaded Uber because it does not provide equivalent services to people with motorized wheelchairs. [1] ¶¶ 34, 37, 44, 49. The reasonable inference from those combined allegations is that they would download and use Uber but for the alleged discrimination.

sufficient to establish that the discrimination will continue.[8] Combined, these allegations are sufficient to plausibly establish Garcia and Cooper's injuries in fact.

### 2.   Access Living

Access Living bases its organizational standing in part on the injury it suffered to its mission because of Uber's alleged actions. An organization suffers an injury-in-fact when the defendant's actions "perceptively impair[ ]" its ability to carry out its usual activities and cause a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). *See also Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990). It is not enough for an organization to allege "simply a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379. Access Living's mission is to advance the civil rights of people with disabilities and to foster their ability to live independently. [1] ¶ 80. Because of Uber's alleged discrimination, Access Living has had to "incur increased costs" to transport its employees who use motorized wheelchairs, diverting those resources that would otherwise be spent in pursuit of its mission. [1] ¶¶ 59, 78.[9]

---

[8] In *Scherr*, the plaintiff did not have standing to sue certain hotels because she did not allege an intent to return to them. "[A]t no point [did Scherr] claim that she would visit a particular Courtyard Marriott but for the alleged ADA violations." 703 F.3d at 1075. This is consistent with the notion that being deterred from a specific accommodation is a sufficiently concrete and particularized injury for constitutional purposes. In *Faircloth v. McDonald's Corp. & McDonald's USA LLC*, No. 18 C 1831, 2018 WL 5921230, at *3 (N.D. Ill. Nov. 13, 2018), the plaintiff did not visit the public accommodation during the hours when the discrimination occurred and did not allege a reasonable prospect of encountering the barriers in the future. The plaintiff lacked both a past injury and a prospect of future discrimination. Garcia and Cooper are different—they know about the accessibility problem with Uber in Chicago, saw it for themselves, want to use the service, and cannot because of Uber's decision to stay the course. This is an actual controversy between litigants.

[9] Uber argues that plaintiffs cannot plausibly allege "that the availability of the uberWAV option somehow *decreased* the transportation options for riders who require WAVs for

Uber argues that Access Living's injury only amounts to a setback to an abstract social interest, particularly because the complaint does not allege that the diverted money would go to specific services. But that part of the injury is reasonably inferred—if Access Living did not spend extra money on employee transportation due to Uber's discrimination, that money would go to the services it provides in support of its mission. Uber cites nothing to suggest that Access Living must allege the specific activities from which its resources have been diverted. Access Living alleges more than an abstract injury to its mission of civil rights for those with disabilities— it alleges that Access Living must pay increased transportation costs for its employees who are unable to use Uber because of discrimination. That is enough for Article III.

### B. Causation and Redressability

Plaintiffs must also allege that their injuries are causally connected to Uber's actions and that a decision in their favor is likely to redress their injuries. These two requirements "overlap as two sides of a causation coin" because "if a [defendant's] action causes an injury, enjoining the action usually will redress that injury." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) (citation omitted). Causation requires plaintiffs' injuries to be "fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party before the court," *Lujan*, 504 U.S. at 560 (citations and alterations

---

transportation and forced Access Living to *increase* the transportation services it provides." [112] at 15 (emphasis in original). But the complaint alleges that Uber has been replacing more traditional forms of transportation, like taxis. [1] ¶ 55. So it is plausible that Uber has increased Access Living's transportation costs for its motorized-wheelchair-bound employees.

removed), but the defendant's actions do not have to be "the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Injuries may be "fairly traceable" to a defendant when the injury is "produced by determinative or coercive effect upon the action of someone else." *Id*. at 169.

Uber's main argument against causation and redressability is that its drivers are independent third-parties who caused plaintiffs' alleged injuries. Its reasoning is that the number of accessible vehicles available on the Uber app at any given moment is up to the drivers, since they control what vehicles they choose to drive and when. So, Uber argues, an injunction against Uber could not increase the number of accessible rides, because Uber does not control drivers' choices. But Uber's argument hinges on a fact not alleged in the complaint—that Uber drivers control which vehicles they use. Uber says that it is "common knowledge" that its drivers "determine whether, when, where, how frequently, and with which vehicles to seek and accept ride requests via the Uber app." [112] at 16 (emphasis removed). It does not cite to allegations in the complaint for that factual assertion, and in making a facial challenge to standing, Uber cannot insert a factual allegation that contradicts plaintiffs' allegations by labeling it "common knowledge." The complaint alleges that Uber does not own its drivers' cars, [1] ¶ 5, but it also alleges that Uber "maintains control over . . . the vehicle." [1] ¶ 5. *See also* [1] ¶¶ 24 ("Uber controls all aspects of its travel service."), 25 ("Uber decides the type and maximum age of car for each of its services.").

11

But even if Uber drivers' own choices of vehicle are what cause plaintiffs' injuries, the cause can be attributed to Uber if its policies or actions have a determinative or coercive effect on the drivers' choices. The complaint alleges several ways Uber controls its drivers. *See* [1] ¶¶ 24–28. These allegations suggest that Uber drivers are not independent of Uber and, as a result, their choices do not break the chain of causation traceable to Uber. And if Uber caused plaintiffs' injuries, then an injunction against Uber—one that directs Uber to use its alleged control over drivers to cure the inadequate supply of wheelchair-accessible rides—is plausibly likely to redress the injuries.

Nor is Access Living's injury "self-inflicted," even if it is not required to pay for its employees' transportation. "Standing is defeated only if it is concluded that the injury is so completely due to the plaintiff's own fault as to break the causal chain." 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.5 (3d ed.). The complaint alleges that Access Living incurs "increased costs" to transport its employees due to Uber's discrimination, [1] ¶ 59, suggesting that it paid transportation costs before Uber's discrimination and did not take up the practice only to self-inflict an injury. Access Living's alleged injuries are not completely its own fault.

## IV. Merits

The ADA's "sweeping purpose" is to "remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674–75 (2001). It "forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public

accommodations (Title III)." *Id.* Plaintiffs bring their claims under two sections of Title III. Section 12182 prohibits discrimination against people with disabilities in public accommodations, and section 12184 prohibits the same in certain public transportation services. *See* 42 U.S.C. §§ 12182, 12184.

### A.    Private Right of Action

Title III authorizes "any person who is being subjected to discrimination on the basis of disability in violation" of Title III to bring a civil action. 42 U.S.C. § 12188(a)(1). Uber argues that Title III does not authorize Access Living to bring suit, because the complaint does not allege that it is being "subjected to discrimination."[10] Access Living responds only that its "claim stems from economic harm and frustration of mission," as argued in response to Uber's standing motion. [129] at 19. Whether Access Living has constitutional standing is a separate question from whether Title III allows it to bring a suit. The former questions whether the constitution grants federal courts the power to hear the case, and the latter questions whether the statute allows a particular plaintiff to enforce it. *See Bank of America Corp. v. City of Miami, Fla.*, 137 S.Ct. 1296, 1302 (2017). A plaintiff might meet the requirements of one and not the other, but its lawsuit can only proceed with both.

Courts have held that Title II confers a private right of action on everyone who meets constitutional standing requirements. *See A Helping Hand, LLC v.*

---

[10] I do not reach the arguments about Patrick's ability to bring a Title III claim because she has not alleged enough to give her constitutional standing. But, I note that section 12184, unlike section 12182, does not contain a discrimination-by-association provision, and Patrick's claim is based entirely on her husband's disability. [1] ¶ 44. And for her section 12182 claim, Patrick does not allege that Uber knew of either her husband's disability or her association to him. *See* 42 U.S.C. § 12182(b)(1)(E).

*Baltimore Cty., MD*, 515 F.3d 356, 363 (4th Cir. 2008); *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 334 (6th Cir. 2002); *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997). *See also Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 279 (7th Cir. 2003) (declining to "agree or disagree with those courts"). Some courts seem to find the same true of Title III. *See, e.g.*, *Equal Rights Ctr. v. Equity Residential*, 483 F.Supp.2d 482, 487 n.7 (D. Md. 2007).

But Uber points to cases holding that Title III is different from Title II and that its private-right-of-action requirements are not co-extensive with those of constitutional standing. *See Small v. Gen. Nutrition Companies, Inc.*, 388 F.Supp.2d 83, 92–93 (E.D.N.Y. 2005). *See also Equal Rights Ctr. v. Equity Residential*, 798 F.Supp.2d 707, 728–30 (D. Md. 2012); *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 210 (D.N.J. 2003). These courts primarily base their holdings on the statutory differences between Title II and Title III. Title II's enforcement provision provides a right of action to "any person alleging discrimination on the basis of disability," 42 U.S.C. § 12133, but Title III's enforcement provision is narrower, providing a right of action to "any person who is being subjected to discrimination on the basis of disability." 42 U.S.C. § 12188(a)(1). This difference in wording shows that Title III "does more than limit the class of persons entitled to sue to those who can *trace their injury* to proscribed discrimination; it limits the class to those who are being, or are under threat of being, *subjected to* proscribed discrimination." *Clark*, 213 F.R.D. at 211 (emphasis in original). I find this reasoning persuasive. Title III requires a plaintiff

14

to have been herself "subjected to discrimination on the basis of disability" to bring suit.

Access Living has not alleged that it was subjected to discrimination by Uber. As Uber points out, Access Living alleges only that its injuries flowed from Uber's alleged discrimination against others.[11] Because Title III does not allow private rights of action for second-hand harm from discrimination, Access Living cannot bring its claim.

## B.      Equality under Title III

In response to the complaint's request for "equivalent services," Uber asserts that "[t]he plain language of Sections 12182 and 12184, the applicable regulations, and relevant case law all show that Title III requires 'equivalent service' *only in* two narrow, mutually-exclusive circumstances." [138] at 6–7 (emphasis in original). Those exceptions, it goes on to say, are when an entity operates a fixed-route or demand-responsive transportation service but is not primarily a transportation business, 42 U.S.C. § 12182(b)(2)(B)–(C), and when an entity that is primarily a transportation business purchases or leases a new van that is not wheelchair-accessible, 42 U.S.C. § 12184(b)(3), (5).

The ADA's requirements are not as black and white as Uber contends. *See Andrews v. Blick Art Materials, LLC*, 268 F.Supp.3d 381, 403 (E.D.N.Y. 2017) (ADA's anti-discrimination provisions are "not simple checklists of clear-cut rules" but rather

---

[11] People without disabilities can bring claims under Title III if they are discriminated against because of their association with someone who does have a disability, 42 U.S.C. § 12182(b)(1)(E), but Access Living does not allege that kind of discrimination.

"standards that are meant to be applied contextually and flexibly"). The ADA tries to provide people with equal access when its achievement is reasonable. *See* 42 U.S.C. §§ 12182, 12184 (providing that people with disabilities must not be robbed of "full and equal enjoyment" of certain goods and services on the basis of their disabilities); *Carparts Distribution Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 19 (1st Cir. 1994) ("In drafting Title III, Congress intended that people with disabilities have equal access to the array of goods and services offered by private establishments and made available to those who do not have disabilities."). This access "does not encompass the notion that persons with disabilities must achieve the identical result or level of achievement of nondisabled persons, but does mean that persons with disabilities must be afforded equal opportunity to obtain the same result." S. Rep. No. 101-116, 1989 WL 1176422, at *57 (1989). *See also Toomer v. City Cab*, 443 F.3d 1191, 1195 (10th Cir. 2006) ("[T]he ADA does not seek to equalize without exception. The ADA does not require *all* accommodation at *any* cost for *all* disabilities." (emphasis in original)). So I agree with Uber that Title III does not always require equality, but it does require entities to provide equal access to people with disabilities when reasonable.

### C.     Section 12182 – Public Accommodation

####     *1.     Whether Uber Operates a Place of Public Accommodation*

Section 12182 prohibits discrimination by "any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). "Public accommodation" is defined by a list of different kinds of entities, including restaurants, zoos, stadiums, and, most applicable here, travel services. 42 U.S.C.

16

§ 12181(7). Uber argues that it does not operate a place of public accommodation, and its argument depends on the assertion that such places must be real, physical spaces.

The Third, Fifth, Sixth, and Ninth Circuits agree with Uber that a place of public accommodation must be a physical space. *See Magee v. Coca-Cola Refreshments USA, Inc.*, 833 F.3d 530, 534 (5th Cir. 2016), *cert. denied*, 138 S.Ct. 55 (2017); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114–15 (9th Cir. 2000); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 613–14 (3d Cir. 1998); *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1014 (6th Cir. 1997) (en banc). They reason that "[e]very term listed in § 12181(7) . . . is a physical place open to public access." *Parker*, 121 F.3d at 1014. Applying the canon of *noscitur a sociis*—meaning, "[i]t is known from its associates"—these courts held that non-physical establishments or entities are not places of public accommodation within the meaning of Title III. *Id*.

The First Circuit, however, has concluded otherwise. *See Carparts*, 37 F.3d at 19. Its reasoning is that the terms listed in section 12181(7) are not all only physical places—for example, a "travel service" can conduct its business by telephone or correspondence—and "[i]t would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not." *Id*. The court found its holding supported by the ADA's legislative history, because "[i]n drafting Title III, Congress intended that people with disabilities have equal access to the array of goods and services offered by private establishments and made available to those who do not have disabilities." *Id*. The Second Circuit has cited *Carparts* approvingly, though it

17

has not committed itself to the *Carparts* position. *See Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28, 32 (2d Cir. 1999).

The Seventh Circuit has twice suggested that it agrees with the First Circuit. In *Doe v. Mutual of Omaha Insurance Co.*, 179 F.3d 557, 559 (7th Cir. 1999), the court explained that section 12182's meaning is "that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (*whether in physical space or in electronic space*) that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do." (citing *Carparts*, 37 F.3d at 19) (emphasis added). The court treated the defendant insurance company as a place of public accommodation but reversed the lower court's judgment in favor of plaintiffs on other grounds. *Id.* at 558–59, 64.

In *Morgan v. Joint Administration Board*, 268 F.3d 456, 459 (7th Cir. 2001), the court said:

> The defendant asks us to interpret "public accommodation" literally, as denoting a physical site, such as a store or a hotel, but we have already rejected that interpretation. An insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell furniture to a disabled person who enters the store. The site of the sale is irrelevant to Congress's goal of granting the disabled equal access to sellers of goods and services. What matters is that the good or service be offered to the public.

*Id.* (citations omitted). In doing so, the court cited to both *Doe* and *Carparts*, as well as the other circuits' conflicting decisions in *Weyer*, *Ford*, and *Parker*. *Id*. Ultimately, however, the court held that the retirement plan at issue was not a public accommodation because it was not offered to the public. *Id.*

18

Uber is right that the Seventh Circuit's statements on this point are dicta, and I am not bound to follow dicta. *See Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 8 F.3d 607, 609 (7th Cir. 1993).[12] Nevertheless, I choose to follow it. *See Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 757 (7th Cir. 1994) (considered dictum "provides the best, though not an infallible, guide to what the law is, and it will ordinarily be the duty of a lower court to be guided by it"). The court's *Morgan* dictum was not a passing thought, but rather an explicit rejection of Uber's argument that a "public accommodation" must be a physical site, made while acknowledging the contrary holdings of other circuits.[13] So though I not bound by *Morgan*'s considered dictum, I elect to follow it. A "place of public accommodation" does not have to be a physical space, and plaintiffs have plausibly alleged that Uber operates a place of public accommodation.[14]

---

[12] As a side note, although I read the Seventh Circuit's comments to be dicta, others understand the court to have picked the *Carparts* side of the circuit split. *See, e.g., Peoples v. Discover Fin. Servs., Inc.*, 387 Fed.App'x 179, 183 (3d Cir. 2010); Brief for the United States as Amicus Curiae on Petition for Writ of Certiorari, *Magee v. Coca-Cola Refreshments USA, Inc.*, 138 S.Ct. 55 (2017) (No. 16-668), 2017 WL 3085074, at *18.

[13] Uber points to *Welsh v. Boy Scouts of America*, 993 F.2d 1267, 1269 (7th Cir. 1993), which holds that "membership organizations that do not maintain a close connection to a structural facility" are not places of public accommodation under Title II of the Civil Rights Act. The court briefly addressed Title III of the ADA, noting that "Congress listed over fifty specific facilities subject to regulation, but did not include membership organizations lacking a close connection to a physical facility." *Id.* at 1270. I find the *Morgan* dictum more considered and persuasive than that in *Welsh*, where the court was principally concerned with another statute altogether.

[14] Uber presents a new argument in its notice of supplemental authority, [141], arguing that Uber does not "operate" a travel service. Uber could have raised this argument, premised mostly on *Village of Bedford Park v. Expedia, Inc.*, 876 F.3d 296 (7th Cir. 2017), in its motion, but it did not. Anyway, it is not persuasive. *See Crawford v. Uber Techs., Inc.*, No. 17-CV-02664-RS, 2018 WL 1116725, at *4 (N.D. Cal. Mar. 1, 2018). ("While Expedia does not exercise control over how hotels listed on its website price their rooms or deal with hotel guests, whether the same can be said of Uber's relationship to its drivers is not clear from the pleadings alone."). Plaintiffs have sufficiently alleged facts that meet *Expedia*'s definitions of "operate," including "exerts power or influence," has a role in "day-to-day

### 2. Access-Content Distinction

Uber argues that the ADA's anti-discrimination provisions only require entities to provide access to their goods or services to people with disabilities and that the ADA does not regulate the content of the goods or services. *See Doe*, 179 F.3d at 560 ("The common sense of the statute is that the content of the goods or services offered by a place of public accommodation is not regulated."). For example, "[a] camera store may not refuse to sell cameras to a disabled person, but it is not required to stock cameras specially designed for such persons," and a bookstore may not refuse to sell books to a person with a vision-related disability, but it is not required to stock Braille books. *Id*. at 559–560. Put another way, an entity does not have to "configure a service to make it as valuable to a disabled as to a nondisabled customer." *Id*. at 560.[15]

The complaint does not allege that Uber refuses to sell its services to plaintiffs. Plaintiffs could be saying that Uber's services are not as useful for them as they are for others due to a lack of available accessible vehicles—a challenge to the content of Uber's service. But the complaint could also be read to allege that Uber has denied plaintiffs meaningful access to Uber's transportation services by providing so few accessible vehicles. Without accessible vehicles that can actually transport them, plaintiffs are shut out of the service, effectively turned away due to their disabilities.

---

management," and "someone who generally oversees the business of running a [service]." 876 F.3d at 304.

[15] Plaintiffs argue this access-content distinction only applies to goods and not services. That is not correct. *See Doe*, 179 F.3d at 560 (referring to "goods *or services*" (emphasis added)).

20

Whether plaintiffs challenge access or content depends on how one describes Uber's services. Does Uber offer the service of providing a forum for requesting rides or the service of providing rides?[16] At this stage, plaintiffs have sufficiently alleged that Uber is a transportation provider, and it is equal access to that service (not a particular type of transportation) that Uber has blocked. *See, e.g.*, [1] ¶¶ 3, 6, 73. If plaintiffs establish liability, it will still remain to be seen whether the requested remedy—that Uber provide service to those who require wheelchair-accessible vehicles—is appropriate under the statute.

### 3.   *Reasonable Modification*

Discrimination under section 12182 includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford . . . services . . . to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such . . . services." 42 U.S.C. § 12182(b)(2)(A)(ii). Uber argues that the complaint does not allege that plaintiffs "actually 'requested a reasonable modification' to a specific policy." [115] at 19. Some courts have interpreted the provision to "require[ ] a person with a disability to request a reasonable and necessary modification, thereby informing the operator of a public accommodation about the disability." *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 309 (1st Cir.

---

[16] The access-content analysis turns on the level of generality with which one describes the relevant service or benefit. *See, e.g.*, Samuel R. Bagenstos, The Future of Disability Law, 114 Yale L.J. 1, 45–50 (2004). The distinction can be unclear in some contexts. *See, e.g.*, *PGA Tour*, 532 U.S. at 698–99 (Scalia, J., dissenting) (disagreeing with the majority's view that a complaint about the PGA's walking rule related to plaintiff's access to the PGA tour and not its content). Here, clarity should follow from more factual development about Uber's business.

2003). This requirement makes sense, to prevent liability and a coercive remedy without notice and an opportunity to address the problem. *Cf. Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996) (request requirement for Title I reasonable accommodation "dictated by common sense lest a disabled employee keep his disability a secret and sue later for failure to accommodate").[17]

But such a request is not necessary when an entity is already on notice about the need for a modification. Courts interpreting similar provisions in Titles I and II have held as much. *See Greer v. Richardson Indep. Sch. Dist.*, 472 Fed.App'x 287, 296 (5th Cir. 2012) ("[A] disabled person's failure to expressly 'request' an accommodation is not fatal to an ADA claim where the defendant otherwise had knowledge of the individual's disability and needs but took no action."); *McCoy v. Texas Dep't of Criminal Justice*, No. C.A.C 05 370, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006) (collecting cites). If Uber already knew that a reasonable modification was necessary to make its services accessible to plaintiffs and chose not to do so, requiring an express request from plaintiffs would serve no purpose. The complaint alleges that Access Living met with members of Uber's staff, showed them that the app offered no accessible vehicles in Chicago, and requested that they "provide people requiring wheelchair accessible vehicles with equivalent service." [1] ¶ 58. "Uber responded that it had no intention of providing equivalent response times." [1] ¶ 58. That

---

[17] Though plaintiffs do not argue it, some courts have rejected the request requirement for Title III claims altogether. *See Aguirre v. California Sch. of Court Reporting (CSCR)-Riverside*, No. CV051601042GHKGJS, 2016 WL 7635957, at *3 (C.D. Cal. Dec. 2, 2016) ("Nothing in the text of Title III requires a disabled individual to request an accommodation before bringing suit.").

meeting was sufficient to put Uber on notice that people like plaintiffs who need accessible vehicles required a modification to access their services—namely, more available accessible vehicles.[18] Uber has cited no authority requiring plaintiffs to themselves each approach Uber to have the same conversation.

Whether the requested modification is reasonable is a "highly fact-specific inquiry." *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 594 (7th Cir. 2018). Without knowing more about Uber's business, and, as a result, the costs of any possible modifications that could result in more accessible vehicles for people with motorized wheelchairs, I cannot determine reasonableness on this motion. It is at least plausible that more accessible vehicles could be made available through reasonable measures. In fact, Uber provides some examples of its "efforts to promote a sustainable WAV marketplace" (though they are not alleged in the complaint), including working with third-party vendors to help drivers get accessible vehicles, marketing those opportunities to its drivers, and "enhancing earning opportunities" for drivers who provide accessible rides. [115] at 7. It is too early to say how reasonable it would be to require Uber to increase or continue any of these practices, but they demonstrate that plaintiffs' request for more accessible rides is at least plausibly reasonable.

---

[18] Though the complaint often expressly refers to "equivalent services," the allegations as a whole make it clear that plaintiffs' more specific request is for more accessible rides. The same is true of the alleged meeting between Access Living and Uber. The complaint alleges that Access Living requested "equivalent service" for people who need accessible rides but also that Access Living showed Uber that no accessible vehicles were available on the Uber app at the time, [1] ¶ 58, the implication being that the "service" problem was the availability problem. Uber argues that the request was not for a modification to a specific policy, practice, or procedure, but an increase of accessible rides would be a modification to Uber's practices.

### 4. Other Section 12182 Discrimination Theories

Plaintiffs claim that Uber discriminated against them in ways other than by failing to make reasonable modifications, including denying them the opportunity to participate in its services and to participate in its services with equal benefit and using discriminatory administrative methods. [1] ¶¶ 61–64; 42 U.S.C. § 12182(b)(1)(A)(i)–(ii), (D). Uber makes no argument about these claims, so they survive. But plaintiffs' claim for a violation of section 12182(b)(2)(C), which applies to demand responsive systems that are not subject to section 12184, does not survive, because Uber is subject to section 12184.

### D. Section 12184 – Public Transportation

Section 12184 applies to private entities "primarily engaged in the business of transporting people and whose operations affect commerce." 42 U.S.C. § 12184(a). Uber argues that an entity meets that definition if its "principal business is actually conveying passengers from place to place for money" and that since Uber does not "actually provide transportation," section 12184 does not apply to it. [115] at 18–19. Even if I accept Uber's definition, plaintiffs' allegations meet its terms. The complaint alleges that Uber "operate[s] a travel service"—it "arranges rides between passengers and a fleet of drivers" and "maintains control over the cost, the vehicle, the driver qualifications, and the general ride experience for each trip." [1] ¶¶ 5, 72. These allegations are sufficient to raise a plausible inference that Uber is "primarily

engaged in the business of transporting people," and Uber's factual disagreement with this characterization of its business is immaterial at this stage.[19]

Uber points out the complaint's allegation that Uber does not itself own or lease the vehicles, [1] ¶ 5, but it has not pointed to anything suggesting that an entity must own or lease vehicles to be subject to section 12184. Uber's citation to *Village of Bedford Park v. Expedia, Inc.*, 876 F.3d 296 (7th Cir. 2017), is not persuasive. In *Expedia*, the court interpreted ordinances that imposed taxes on entities "engaged in the business of renting hotel rooms." *Id*. at 305. Uber points in particular to the court's reasoning that that the ordinances do not apply to online travel agencies, like Expedia, because "renting implies ownership and granting possession of property," and the online agencies do not own hotel rooms and thus cannot rent them. *Id*. That analysis hinged on what it means to "rent"—a term not present in section 12184— and the complaint's allegations paint Uber's role in the transportation business as being more than the mere facilitator of rentals that Expedia was.

The basis of plaintiffs' section 12184 claim is that Uber failed "to make reasonable modifications," which imposes the same obligations as the "reasonable modification" provision in section 12182. 42 U.S.C. § 12184(b)(2)(A). Plaintiffs have

---

[19] Uber argues that "an entity's 'control' over third-parties who are subject to Section 12184 . . . does not make the entity responsible for the controlled third-parties' compliance," [138] at 11 & n.3, relying on *Noel v. New York City Taxi & Limousine Commission*, 687 F.3d 63, 71–72 (2d Cir. 2012). But in *Noel*, the court was deciding whether a New York City agency's control over taxis made the private taxi authority a program or activity of a public entity under Title II. *Id*.

stated a claim for Uber's failure to modify under section 12184 for the same reasons they have under section 12182.[20]

## V.  Conclusion

Uber's motion to dismiss [117] is granted in part, denied in part, and its motion for judgment on the pleadings [119] is granted in part, denied in part. Access Living and Patrick's claims are dismissed without prejudice, but Garcia and Cooper may pursue claims for injunctive relief under sections 12182 and 12184.

ENTER:

Manish S. Shah
United States District Judge

Date: December 17, 2018

---

[20] Plaintiffs do not allege a violation of section 12184(b)(3), which requires transportation entities buying or leasing a new vehicle to get one that is accessible to people with disabilities, with some exceptions. As Uber points out, "[p]roviders of taxi service are not required to purchase or lease accessible automobiles." 49 C.F.R. § 37.29(b). But plaintiffs do not ask that Uber purchase or lease accessible vehicles.